**WEYBURN BROADCASTING LIMITED PARTNERSHIP, Appellant,**

· v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**James River Communications Corporation, Intervenor.**

**Nos. 91–1378, 91–1383, 91– 1405 and 91–1411.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 4, 1992.

Decided Feb. 12, 1993.

Rehearing Denied April 13, 1993.

Lauren A. Colby, Frederick, MD, with whom Morton L. Berfield, John J. Schauble, Eric S. Kravetz, Robert J. Rini, and Michael E. Beller, Washington, DC, were on the joint brief, for appellants. Morton L. Berfield and John J. Schauble, Washington, DC, also filed a separate brief for appellant Weyburn Broadcasting Limited Partnership in No. 91–1378.

Roberta L. Cook, Counsel, with whom Robert L. Pettit, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, Federal Communications Com'n, Washington, DC, were on the brief, for appellee.

Richard J. Bodorff and Diane Zipursky, Washington, DC, entered an appearance for intervenor James River Communications Corp.

Before MIKVA, Chief Judge, and SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Dissenting opinion filed by Chief Judge MIKVA.

SENTELLE, Circuit Judge:

Appellants Weyburn Broadcasting Limited Partnership ("Weyburn"), Barbara B. Benns ("Benns"), Future Broadcast Limited Partnership ("Future") and WKIE–FM, Inc. ("WKIE") seek review of a Federal Communications Commission ("FCC" or "Commission") decision granting a construction permit for a new FM radio station on Channel 266A in Richmond, Virginia, to intervenor James River Communications Corporation ("James River"). *See Weyburn Broadcasting Limited Partnership*, 4 F.C.C.R. 5310 (ALJ 1989) (*"Initial Decision"*); 5 F.C.C.R. 861 (Rev.Bd.1990) (*"Remand Order"*); 5 F.C.C.R. 3812 (ALJ 1990) (*"Supplementary Decision"*); 6 F.C.C.R. 1262, 1266–68 (Rev.Bd.1991) (*"Board Order"*); 6 F.C.C.R. 4474 (1991) (*"Commission Order"*). Appellants, competing applicants for the new station, raise numerous challenges to James River's application.

The FCC resolved a financial qualification issue in James River's favor and declined to designate other issues for hearing, including whether James River's structure hid the real party-in-interest, a misrepresentation and candor issue, and a character issue. Because appellants were entitled to a hearing before an Administrative Law Judge ("ALJ") on several of these issues, we vacate and remand to the FCC.

## I. BACKGROUND

### A. The Statutory and Regulatory Framework

The FCC identifies two primary objectives governing its selection of licensees for new broadcast stations: 1) achieving the best practicable service to the public, and 2) diversifying ownership of mass communications media. *Policy Statement on Comparative Broadcast Hearings*, 1 F.C.C.2d 393, 394 (1965) (*"Policy Statement"*). In addressing the first objective, the FCC gives substantial weight to the integration of station ownership and management. *Id.* at 395. When evaluating applications, the FCC awards each application a quantitative integration credit proportional to the ownership of the proposed station by day-to-day managers. For example, if a proposed manager owns a 50% interest in the company, the applicant receives a 50% integration credit. This quantitative credit is qualitatively enhanced if the integrated owners possess certain other characteristics, such as minority status, local residence, civic participation, and broadcast experience. *Id.* at 395–96.

In recent years many applicants have used limited partnerships and corporations with non-voting stock as vehicles for raising capital. This type of ownership structure could handicap an applicant under the "integration of ownership with management" criterion. For example, if 80% of a partnership's shares were owned by limited partners, only the remaining 20% would be available for integration with management. A 20% quantitative integration credit would rarely win a comparative broadcast proceeding. In recognition of the value of

limited partnerships and non-voting stock as vehicles for raising capital, the FCC disregards the ownership interest of passive investors when computing the applicant's quantitative integration credit. This is known as the *Anax* doctrine, after *Anax Broadcasting Inc.*, 87 F.C.C.2d 483, 488 (1981). Thus, if 20% of an applicant's equity is owned by a general partner who proposes to manage the station full time, and the other 80% is owned by passive investors, the applicant will receive a 100% integration credit.

To minimize abuse, the Commission examines limited partnerships and two-tiered stock corporations seeking to benefit from the *Anax* doctrine, to determine whether nominally passive investors in reality exert significant influence or control over the applicant's business. *KIST Corp.*, 102 F.C.C.2d 288, 290 n. 5 (1985), *aff'd mem. sub nom. United American Telecasters, Inc. v. FCC*, 801 F.2d 1436 (D.C.Cir.1986), *cert. denied*, 481 U.S. 1050, 107 S.Ct. 2182, 95 L.Ed.2d 839 (1987). If a "passive" owner actively participates in the applicant's affairs, the Commission attributes all of that "passive" owner's interest as active interest in calculating integration credit. *Royce Int'l Broadcasting*, 5 F.C.C.R. 7063, 7064 (1990).

Applicants for new broadcast licenses must also demonstrate that they are "financially qualified." 47 U.S.C. § 308(b) (1988). *See Northampton Media Assocs. v. FCC*, 941 F.2d 1214 (D.C.Cir.1991). To be "financially qualified," an applicant must have "reasonable assurance" of sufficient financial resources to build the station and operate it for the first three months, without relying on station revenue. *Financial Qualification Standards for Aural Broadcast Applicants*, 69 F.C.C.2d 407, 408 (1978). In 1981 the FCC simplified the manner by which applicants establish that they are financially qualified. Applicants may now certify, as opposed to document, their financial qualifications, although the substantive requirements have not changed. *See South Florida Broadcasting Co.*, 94 F.C.C.2d 452, 455 (1983); *Revision of Form 301*, 50 Rad.Reg.2d (P & F) 381, at ¶ 6 (1981).

### B. *The James River Application*

Claudette McDaniel has a 20% equity interest in James River, is its sole voting shareholder, and proposes to work full time as General Manager. The remaining 80% equity interest was initially owned by Dr. Renard Charity, Dr. Cynthia Charity, and later, Dr. Michael Kyles. During the pendency of the consolidated proceedings, Robert Fish, a former competing applicant who owns broadcast stations in Rhode Island and Kentucky, acquired all of the shares of the Charitys and Kyles. James River's financial certification was based upon a loan commitment letter from the Bank of Virginia when the Charitys were the passive investors, and a letter from Fleet National Bank when Fish bought the Charitys' shares.

After an evidentiary hearing, the ALJ awarded James River a 100% integration credit pursuant to the *Anax* doctrine for McDaniel's proposed full time employment as General Manager of the station. The application also received substantial qualitative enhancements for McDaniel's continuous forty-year residence in Richmond (the community of license), her extensive involvement in Richmond civic activities (she served on the City Council), her previous broadcast experience (she has hosted a radio talk show), and her minority and female status. Because McDaniel had no attributable media interests, James River had no offsetting demerits under the "diversification of control" criterion. *Initial Decision*, 4 F.C.C.R. at 5338–39, 5340; *Board Order*, 6 F.C.C.R. at 1266. Based upon these findings, the ALJ, the Review Board and the Commission all concluded that James River was the comparatively superior applicant. *Initial Decision*, 4 F.C.C.R. at 5340; *Supplementary Decision*, 5 F.C.C.R. at 3812; *Board Order*, 6 F.C.C.R. at 1266; *Commission Order*, 6 F.C.C.R. at 4474.

### C. *The Administrative Proceedings*

In March 1988, the FCC held a consolidated hearing before ALJ Joseph Chachkin involving thirty-five applications to operate

the new FM station. *See Hearing Designation Order*, DA 87–1213, released September 8, 1987, reprinted in Joint Appendix ("J.A.") 1. Only four of the unsuccessful applicants appealed.

1. *The Consolidated Hearing.* During the hearing, Benns petitioned the ALJ to add financial issues against James River based on lawsuits against McDaniel by Dominion Bank of Richmond for approximately $10,000 and by Commercial Credit Corporation for approximately $9,000. Also, Future filed a "Petition to Enlarge Issues" requesting misrepresentation and lack of candor issues regarding James River's financial, legal and statutory qualifications, ownership certification, and real party-in-interest. Future's motion contended that events occurring after the designation of the applications for comparative hearing had raised questions concerning the continued viability of the Bank of Virginia's loan commitment letter, and thus of the financial qualification of the James River application.

In September 1987, several weeks after the applications had been set for a hearing, a medical center building under construction, in which the Charitys were major investors, collapsed, killing a construction worker. McDaniel testified in a deposition that she became concerned that the Charitys had "tremendous financial problems," and began to look for other investors. McDaniel Dep. Tr. 132–133, 136; J.A. 153–55. Meanwhile, James River's attorney had withdrawn from representing James River because he had not been paid over $9,000 in legal fees. The Charitys' alleged financial problems were never reported to the Bank of Virginia and its "reasonable assurance" letter was never amended. The FCC was not informed of any change in James River's financial qualifications. Future maintains that pursuant to section 1.65 of the FCC's rules, McDaniel had a duty to report these events to the FCC and to withdraw their support for the James River application.

Future also introduced two pieces of evidence raising doubts about McDaniel's integrity. The first was a magazine article concerning allegations that McDaniel had submitted false reimbursement vouchers and received illegal *per diem* expenses as a member of the Virginia Board of Corrections. The second was a series of newspaper articles which reported on police investigations concerning trips McDaniel took for the City of Richmond while she was on the City Council and a lawsuit concerning the Richmond City Council's decision to dock $1,000 from McDaniel's salary because she never attended meetings for which she obtained reimbursement from the city. McDaniel testified that there was never any official police investigation and that the dispute over her salary was a political fight between council members that had been resolved out of court. McDaniel Dep. Tr. 111–12; J.A. 151–52.

The ALJ denied both motions to add issues. *Memorandum Opinion and Order*, FCC 88M–1121, released April 15, 1988, J.A. 6–8; *Memorandum Opinion and Order*, FCC 89M–860, released March 17, 1989, J.A. 9–10. The ALJ denied Benns' financial issue regarding the lawsuits over McDaniel's unpaid bank loans because "both lending institutions were repaid prior to the filing of Benns' motion and the suits for collection of the money were withdrawn," rebutting questions about McDaniel's financial stability. *Memorandum Opinion and Order*, FCC 89M–860, at 2; J.A. 10. In rejecting Future's request for a financial issue, the ALJ declared that Future had failed to offer any evidence "showing a causal link (a) between the building collapse and the impact of this event upon the financial wherewithal of the Drs. Charity and (b) between the financial posture of the Drs. Charity and the Bank of Virginia's loan commitment to Ms. Claudette McDaniel." Thus, the ALJ deemed Future's financial misrepresentation issue "wholly without support." *Memorandum Opinion and Order*, FCC 88M–1121, at 2; J.A. 7.

2. *Exceptions Filed With the FCC Review Board.* Appellants filed exceptions to the ALJ's Initial Decision with the FCC Review Board. Benns also filed a "Petition to Reopen the Record and Enlarge the Issues Against James River" to determine

whether McDaniel had sold her vote on the Richmond City Council in order to secure the original financing for James River's application and to determine whether McDaniel was lacking in candor when she testified concerning the circumstances surrounding the procurement of James River's original financial commitment. Criminal warrants filed against McDaniel by the commonwealth attorney in Richmond specifically alleged that McDaniel received the first $2,000 of a $6,000 loan from Renard Charity before she voted in favor of an ordinance that allowed the construction of a medical office building in which Charity had an unspecified financial interest. *See* J.A. 516.

The Review Board denied the issues requested by Benns, but concluded substantial and material questions of fact had been raised concerning the continuing viability of James River's financial proposal. The Board noted a number of factors that raised questions about James River's continual financial qualifications, including: the building collapse which allegedly caused the Charitys financial harm; the status of the Bank of Virginia's letter of reasonable assurance of a loan to James River after the collapse; the two bank lawsuits against McDaniel, which may have indicated that she was unable to pay the expenses of prosecuting the applications; and the withdrawal of James River's FCC counsel for nonpayment of legal fees, indicating James River was unable to meet its prosecution expenses. It therefore remanded the case to the ALJ for a further hearing on two issues: (1) whether James River had been continuously financially qualified since it filed its applications, and (2) whether James River had violated section 1.65 of the Commission's rules, 47 C.F.R. § 1.65 (1991), by failing to report material information concerning its financial qualifications.

3. *Remand Proceedings Before the ALJ.* On remand further discovery was taken. Benns hoped to prove that after Fish became a shareholder in James River, McDaniel diverted for personal use some of the money Fish sent her to deposit into the corporate account. The ALJ, however, refused to allow any inquiry into that matter or into the question of whether McDaniel had solicited loans from third parties in an effort to obtain money to pay James River's bills and prosecute the application. Even after discovery uncovered evidence that McDaniel had paid the $6,000 hearing fee in cash at a Western Union office, the ALJ refused to allow any inquiry into the source or destination of the payment. The ALJ also disallowed any inquiry about when Dr. Renard Charity loaned $2,000 to McDaniel.

### a. *Benns' Further Motion to Enlarge Issues*

### i. *Misrepresentation/Lack of Candor*

Even though the scope of discovery had been severely restricted by the ALJ, Benns filed a "Further Motion to Enlarge Issues," requesting issues to determine whether James River's principals had misrepresented facts and lacked candor. In her petition, Benns referred to a "smoking gun," a ledger showing that the Charitys had signed and received stock certificates drawn up on December 11, 1985, but did not pay the $1.00 per share purchase price until almost a year later, on December 2, 1986. The Charitys had earlier signed letters of subscription promising to pay for the shares upon receiving them.

Appellants also note that during depositions and at the original hearing, McDaniel gave three conflicting accounts of when the Charitys signed and paid for the certificates. McDaniel also gave conflicting stories of when and if she paid for her shares. At a deposition on January 19, 1988, McDaniel stated that the stock certificates were distributed at a meeting held in her attorney's office in Richmond on December 11, 1985. McDaniel Dep. 7–8; J.A. 143–44. Although McDaniel was less than clear, she implied that she paid for the stock at that time. The stock certificates issued stated that they were "fully paid and nonassessable." J.A. 443–54.

On March 18, 1988, at the consolidated hearing, McDaniel contradicted her previous testimony with respect to the Decem-

ber 11, 1985 meeting, and testified that a runner had brought the stock certificates to her, that she paid for the stock that day, and that she signed all the various corporate documents at that time. Hear.Tr. 1301; J.A. 112. She also said she was certain the Charitys paid for their stock before the stock certificates dated December 11, 1985 were issued to them. Hear.Tr. 1298, 1300; J.A. 109, 111.

Documents were produced that showed that no money was deposited in the corporate account until December 2, 1986, nearly a year after the stock was issued. Two payments, each in the amount of $3,500 were made at that time, apparently by the Charitys. The ledger sheets showed that Dr. Kyles never paid for his stock, and reflected no payment by McDaniel for her stock, in conflict with her previous testimony. J.A. 633.

At a second deposition, on April 27, 1990, McDaniel stated that she had never fully paid for her stock, but paid only $500 of the $2,000, and was not sure when she made that payment. McDaniel Richmond Dep. 12–13; J.A. 162–63.

The ALJ denied Benns' motion. He ruled that James River's shareholders' failure to pay for their subscriptions when the application was filed did not indicate an intention not to pay. He concluded instead that the subscriptions were evidence of a future intent to pay and that the weight of the evidence established that shareholders were at all times committed to paying, and willing and able to pay, the applicant's expenses. He also discounted the importance of the discrepancies in McDaniel's account of her stock payments, attributing them to memory lapses. *Memorandum Opinion and Order*, FCC 90M–1737, released June 20, 1990; J.A. 54–59.

### ii. *Financial Control/Real Party–In–Interest*

Benns also requested the addition of a "real party-in-interest" issue to address whether there had been an improperly concealed transfer of control of James River from McDaniel to Fish, and whether Fish is the real party-in-interest in the James River application. To support her request, Benns pointed out that McDaniel has executed promissory notes with Fish covering her share of the prosecution expenses, which allegedly run only in Fish's favor and give him extraordinary leverage over McDaniel. McDaniel also signed a series of confession-of-judgment notes payable to Fish for $20,000, $2,960.45 and $3,829.99, which fall due in their entirety only three days after a grant of James River's application, and provide that Fish can call the notes at any time if he determines there has been a material adverse change in McDaniel's financial position. Moreover, Benns alleged, Fish had completely taken over James River's financial affairs. While Fish originally sent money to McDaniel to deposit in the corporation's bank account for the payment of corporate bills, he admitted that he had later paid corporate bills, including legal fees, directly himself.

The ALJ concluded that neither the promissory notes nor Fish's direct payment of bills "demonstrate that Fish has exercised decisional control over James River." *Id.* at 2; J.A. 55. He further found that there was no evidence that Fish was actually making decisions for the corporation or had taken any action other than paying corporate bills. In fact, the ALJ noted, there was a Memorandum of Agreement between McDaniel and Fish which positively denied Fish any authority to exercise decisional control. *Id.* at 3; J.A. 56. The ALJ stated that even if McDaniel defaulted on the notes, that would not deprive her of her right to continue as James River's sole voting shareholder.

### b. *Benns' Motion For Summary Decision*

Based upon the evidence adduced through discovery and depositions, Benns moved for summary decision against James River. She asserted three grounds in her motion against James River. First, McDaniel had estimated that it would cost approximately $200,000 to prosecute the James River application, but she did not have even "a shadow of an idea as to how these monies might be raised." Second,

James River's shareholders did not timely pay for their stock, and McDaniel never fully honored her stock subscription obligation. Third, at one point the Charitys refused to pay their share of the $6,000 hearing fee, of which McDaniel failed to inform the Commission. Thus, as a matter of law, Benns argued, James River had not been continuously financially qualified since the filing of its application and had violated 47 C.F.R. § 1.65 by failing to report material information concerning its financial qualifications.

The ALJ denied Benns' motion, *Weyburn Broadcasting Ltd. Partnership*, No. FCC 90–1738, slip op. (A.L.J. released June 20, 1990), concluding that under FCC precedent, an applicant cannot be found financially unqualified if, as here, legal fees are rendered current and are paid from a source other than that relied upon for construction and operating costs. The ALJ noted that James River had made consistent and substantial payments for prosecution expenses and was current and paid-in-full on such expenses and so had not failed to meet its prosecution expenses. He dismissed concerns about the timing of payment for the stock as "entirely irrelevant" because the stock subscription agreements "evidence a commitment to pay for stock at some future date." *Id.* at 3. With respect to the hearing fee, the ALJ concluded that the Charitys' insistence that McDaniel pay prosecution expenses simply reflected their desire that she pay her *pro rata* share of expenses and that they never disavowed their own commitment to pay their 80% share.

### c. *James River's Motion for Summary Decision*

The ALJ granted James River's Motion for Summary Decision, after resolving questions about the Charitys' building collapse, the Bank of Virginia commitment, the lawsuits against McDaniel, and payment of prosecution expenses in James River's favor. *Supplementary Summary Decision of Administrative Law Judge Joseph Chachkin*, 5 F.C.C.R. 3812 (ALJ 1990).

4. *Review of the ALJ's Rulings.* The FCC's Review Board affirmed the ALJ's resolution of the financial and reporting issues and award of a 100% integration credit to James River. *Board Order*, 6 F.C.C.R. 1262 (Rev.Bd.1991). The Review Board agreed that no substantial or material questions of fact remained concerning James River's basic financial qualifications, so an evidentiary hearing was deemed unnecessary. Appellants each filed applications for review with the full Commission, which the FCC denied, thereby affirming the Review Board's decision. *Commission Order*, 6 F.C.C.R. 4474 (1991). Future, Weyburn, WKIE and Benns all timely appealed to this Court. Their cases were consolidated. Weyburn separately appealed the FCC's denial of full integration credit for its application, claiming the Commission acted in an arbitrary and capricious manner, failed to follow precedent, and treated Weyburn inconsistently with James River. James River intervened to defend the FCC's actions.

## II. STANDARD OF REVIEW

■ Before discussing the issues raised in this appeal, we pause to clarify the standard of review applicable in our evaluation of the Commission's actions.

The Communications Act provides:

If ... a substantial and material question of fact is presented [by a covered application for an FCC license] ..., [the Commission] shall formally designate the application for hearing on the ground or reasons then obtaining.... Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate.

47 U.S.C. § 309(e) (1988). We recently elucidated the Act's standard for designating an issue for hearing in *David Ortiz Radio Corp. v. FCC*, 941 F.2d 1253 (D.C.Cir.1991). There we said "[b]efore the FCC will hold a hearing, the dispute must be clearly and adequately alleged, it must be factual, and it must rise to the level of a substantial and material issue." *Id.* at 1257 (internal quotation marks omitted). We review the

FCC's determination of whether a hearing is warranted under the deferential standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1988) (agency actions to be set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

### III. FINANCIAL QUALIFICATIONS

■ Appellants argue first that the FCC incorrectly determined that James River was continuously financially qualified. Appellants repeatedly attempted to raise financial qualification issues, but the ALJ refused to add a financial issue in the consolidated hearing. The FCC Review Board reversed the ALJ, added the issue of James River's financial qualification, and remanded the proceeding to the ALJ for additional hearings. The ALJ did not, however, hold any new hearings; rather, he granted James River's Motion for Summary Decision after further discovery. The Review Board and the Commission were satisfied with the ALJ's resolution of the financial qualification question on remand. We are not.

■ As noted, an applicant for a broadcast license must demonstrate that it is financially qualified before it is eligible for a broadcast license. In *Northampton Media Assocs. v. FCC*, 941 F.2d 1214 (D.C.Cir. 1991), we held that an applicant would be considered financially qualified if at the time of certification it "has reasonable and reliable evidence that the necessary funds would be available...." *Id.*

The FCC argues that it acted reasonably in resolving the financial qualification issue in James River's favor without conducting a full evidentiary hearing. The Commission's rules authorize an ALJ to grant a motion for summary decision when the pleadings, affidavits, materials obtained by discovery or otherwise, admissions, or matters officially noticed, show that there is "no genuine issue as to any material fact." 47 C.F.R. § 1.251(d) (1991).

The FCC maintains that on remand the ALJ permitted the parties to adduce all relevant documentary evidence. Numerous depositions were also allowed and taken. The FCC maintains that appellants had ample opportunity to cross-examine witnesses at deposition.

When the financial issue was remanded, the ALJ did evaluate a number of allegations relating to James River's financial qualification. Before granting James River's motion for Summary Decision, the ALJ considered several issues and reached the following conclusions:

(1) Whether the collapse of the Charitys' medical building caused them financial harm, adversely affecting the financial qualification of the James River Application. The ALJ concluded the building collapse had no adverse effect on the financial ability of the Charitys. *Supplementary Decision*, 5 F.C.C.R. at 3813; J.A. 64.

(2) Whether the Bank of Virginia's letter of reasonable assurance of a loan to James River had been adversely affected by financial hardships suffered by the Charitys associated with the building collapse. The ALJ concluded the Bank of Virginia letter remained valid and in full force from the day it was issued until the day Robert Fish acquired the Charitys' stock. The building was insured and the Charitys' net worth was at all times sufficient to support a $500,000 loan, as outlined in the Bank of Virginia Letter. *Id.*

(3) Whether the lawsuits filed against McDaniel by Commercial Credit Corporation and by Dominion Bank of Richmond indicated an inability on McDaniel's part to pay expenses of prosecuting James River's application. The ALJ found that the two lawsuits against McDaniel were paid in full and withdrawn and did not affect McDaniel's ability to meet her 20% financial commitment to James River. Before the Charitys' shares were sold to Fish, McDaniel actually paid more than her *pro rata* share of the prosecution expenses, and after Fish purchased the Charitys' shares, McDaniel maintained a commitment through the promissory notes she signed to pay 20% of the remaining expenses. *Id.* at 3813–14; J.A. 64–65.

(4) Whether the withdrawal of James River's FCC counsel for nonpayment of

legal fees indicated an inability on the applicant's part to meet its prosecution expenses. The ALJ concluded the withdrawal of James River's FCC counsel did not indicate an inability to pay prosecution expenses because the applicant had made consistent and substantial payments for prosecution expenses and was current and paid-in-full on such expenses. *Id.* at 3814; J.A. 65.

Based upon these findings, the ALJ concluded that James River had been continuously financially qualified from the date of filing its application, and that James River had not violated the Commission's reporting requirements. The ALJ stated that although James River's opponents had "the benefit of deposing all witnesses with pertinent evidence" and had access to "voluminous documentary evidence, their mighty labors have failed to uncover even a shred of doubt as to James River's financial qualifications." 5 F.C.C.R. at 3814. The ALJ held there was no genuine issue of material fact left to be determined and that a summary decision in James River's favor was therefore mandated. *Id.*

■ We conclude that in this the ALJ was wrong. Although "[t]he FCC has substantial discretion in acting on a motion for summary decision," *David Ortiz Radio Corp. v. FCC*, 941 F.2d 1253, 1258 (D.C.Cir. 1991), substantial and troubling questions of material fact remain concerning whether James River was continuously financially qualified. First, as appellants point out, McDaniel testified prior to filing James River's application that she had a written financial plan, but that plan excluded legal and engineering costs. At one point

McDaniel estimated that the legal costs of prosecuting the James River application would be $200,000. One of her partners, Renard Charity, testified that he thought it would cost $50,000. R. Charity Dep. 20, 38; J.A. 199, 201A. A legitimate question arises as to whether the investors in James River had come to a meeting of the minds about the costs of prosecuting its application. This is particularly relevant because it was a line of credit guaranteed by the Charitys that was the basis for James River's financial qualification.[1]

The FCC has previously disqualified applicants who do not have clear and workable financial plans. For example, in *Las Americas Communications, Inc.*, 61 Rad. Reg. (P & F) 1008, at ¶ 10 (Rev.Bd.1986), the FCC held that all construction permit applicants were required to have written documentation at time of certification showing actual anticipated costs and their plan to meet those costs. Although the FCC has stated that *Las Americas* was "effectively overruled" by *Northampton Media Assocs.*, 3 F.C.C.R. 570 (ALJ 1988), *aff'd*, 3 F.C.C.R. 5164 (Rev.Bd.1988), *rev. denied*, 4 F.C.C.R. 5517 (1989), we stated in *Northampton* that this "does not meet the Commission's basic obligation to provide a reasoned explanation for its change in practice." *Northampton Media Associates v. FCC*, 941 F.2d 1214, 1216 (D.C.Cir.1991). *See Office of Communication of United Church of Christ v. FCC*, 911 F.2d 803, 809 (D.C.Cir.1990); *Alegria I, Inc. v. FCC*, 905 F.2d 471, 474–75 (D.C.Cir.1990). We did not remand the *Northampton* case. In that case, although the FCC declined to disqualify an applicant who did not have

---

1. The dissent asserts that we ignore "a long line of FCC decisions, cited by the ALJ below and raised again by the agency before this court, holding that a projection of total prosecution expenses need *not* be taken into account in determining the applicant's financial ability to construct and operate the proposed station where an applicant has shown herself willing and able to pay such expenses on a current basis. *See Port Huron Family Radio*, 5 F.C.C.R. 4562, 4563 (1990); *Northampton Media Associates*, 3 F.C.C.R. 5164, 5167 (Rev.Bd.1988), *review denied*, 4 F.C.C.R. 3858 (1989), *aff'd on other grounds, Northampton Media Associates v. FCC*, 941 F.2d 1214 (D.C.Cir.1991); *Muncie Broad-*

*casting*, 54 Rad.Reg.2d 42, 46–47 (1983); *Zia Tele-Communications, Inc.*, 50 F.C.C.2d 182, 187–89 (Rev.Bd.1974)." Dissent at 1235.

In those cases the FCC permitted financial plans that did not include legal fees and other prosecution expenses, but expressly noted that they were paid as incurred. Here, legal fees were in arrears. Further, in none of those cases was there evidence of disagreement among the principals about the cost of prosecuting the application.

None supports the proposition that an applicant's failure to pay ongoing prosecution costs cannot be taken into account in evaluating the financial qualifications of an applicant.

documentation on hand to support its certification that it was financially qualified, "there was other reasonable and reliable evidence that funds would be available." 941 F.2d at 1217. Our holding in *Northampton* does not stand for the proposition that applicants do not have to have financial plans. In the case before us today, there does not appear to be independent evidence that McDaniel had reasonable and reliable evidence of her financial ability to meet her share of prosecution expenses.

Second, it is undisputed that the Charitys were to provide 80% of the application prosecution costs and McDaniel was to provide 20%. The record suggests, however, that neither McDaniel nor the Charitys established that each other could pay their share of expenses. C. Charity Dep. Tr. 45; R. Charity Dep. Tr. 49; J.A. 208, 220. In other cases, the FCC has held that such behavior is grounds for financial disqualification. *See Pepper Schultz*, 4 F.C.C.R. 6393, 6399 (Rev.Bd.1989) (noting that before *Northampton Media* the FCC Review Board had consistently interpreted financial qualification to rest upon existence of financial documentation); *Aspen FM, Inc.*, 4 F.C.C.R. 4642 (1989) (applicant disqualified when there was no exchange of financial information before certification); *JAM Communications, Inc.*, 4 F.C.C.R. 3754, 3757 (Rev.Bd.1989) (holding that applicants must have "documentation at hand" when applying); *Capital City Community Interests, Inc.*, 62 Rad.Reg.2d (P & F) 1452, at ¶ 4 (Rev.Bd.1987) (disqualifying UHF applicant on financial grounds when no balance sheets or other financial documentation had been obtained from the principals who were to be relied upon for funding); *Las Americas Communications, Inc.*, 61 Rad.Reg.2d (P & F) 1008, at ¶¶ 8–9.

Third, according to her latest testimony, McDaniel only paid $500 of the $2,000 due for her stock and was not sure when she paid for it.[2] McDaniel Richmond Dep. 12–13; J.A. 162–63. There is also uncontroverted evidence that nearly a year passed between the time James River's stock was

issued in December 1985 and the Charitys finally paid for their stock. During that time, the corporation's bills went unpaid and its attorney withdrew for non-payment. Appellants believe this shows James River was not financially qualified between December 1985 and December 1986. The FCC responds that the fact the stock was not paid for at the time of subscription is immaterial because each stockholder was committed via the stock subscription to pay for the stock.

But it is not altogether clear that this was the case. It appears that Kyles never paid for his stock, and McDaniel says she only paid $500 of the $2,000 she received. Moreover, the FCC's argument misses the point: the stock subscription agreements are not at issue. What is at issue is that "shares" of stock were signed and issued. Those shares indicated that they had been paid for, but in fact they were not paid for, if at all, until nearly a year later. For over a year there were no funds in James River's corporate account and its bills went unpaid. In view of these facts, the Commission has failed to explain how James River could have been financially qualified during this period of time.

Fourth, we think it a legitimate question of material fact whether the Charitys remained committed to the James River application after their building collapsed. The ALJ concluded that at all times the Charitys were "willing and able" to pay their share of James River's prosecution expenses. *Weyburn Broadcasting Ltd. Partnership*, No. FCC 90–1738, slip op. (A.L.J. released June 20, 1990); J.A. 62. The ALJ and FCC are responsive to the question whether the Charitys remained financially able to meet their financial commitment to James River, 5 F.C.C.R. at 3813; 6 F.C.C.R. at 1263, but the Charitys' willingness to do so remains in greater doubt. For example, McDaniel certainly perceived that their interest was waning and began to search for replacement investors. A hearing would thus be in order to

---

2. During that deposition, McDaniel recalled her stock obligation to be $2,500, but based on the stock subscriptions, the correct figure appears to be $2,000.

establish what the Charitys' level of commitment was.

Fifth, we are troubled by McDaniel's $6,000 cash payment for the hearing fee. The deposition record shows she was evasive as to the source of the money. McDaniel Richmond Dep. 145–47; J.A. 593–95; supplement to Joint Appendix, 76, 146–47, 168–69. Even though the source of the money would appear to be relevant to the question of McDaniel's ability to pay for her share of the prosecution expense, *see Key Broadcasting Corp.*, 3 F.C.C.R. 6587 (ALJ 1988); reviewed in *Ocean Pines LPB Broadcast Corp.*, 5 F.C.C.R. 5821 (Rev.Bd. 1990); *Fenwick Island Broadcasting Corp.*, 7 F.C.C.R. 2978 (1992) (Review Board and Commission sustaining ALJ finding that application a sham in which wealthy physician who had been limited partner gave $6,000 to general partner to pay hearing fee), the ALJ refused to let the parties pursue the issue through discovery and in depositions.

■ Sixth, the ALJ's failure to allow questions about whether or not Renard Charity loaned McDaniel $2,000 on or about December 1985 was also error. The issue of financial control of the James River application was and is being challenged, and loans made by Charity to McDaniel have a bearing on the question of who truly controlled the James River corporation.[3]

The FCC's conclusion that McDaniel did not violate 47 C.F.R. § 1.65 by not disclosing certain information undermining James River's financial qualification was premature, because a full airing of the financial qualification issues never occurred. Since a hearing was never held to determine whether the Charitys in fact remained at all relevant times committed to meeting their James River commitments, it is impossible for us or the Commission to determine whether the requirements of section 1.65 were met.[4]

In sum, we note that the ALJ's conclusion that there were no questions of material fact concerning the continuous financial qualification of James River was arbitrary and capricious. Many unanswered questions remain. Was there at all times a clear, workable financial plan? If so, why were expectations about prosecution costs by the principals so radically different? Did the Charitys and McDaniel both have reasonable assurance that the other party could meet their financial obligations? What was the significance of the fact that the stock, which was labeled "fully paid," was in fact not paid for until nearly a year after it was issued? Were the Charitys at all times committed to James River? If not, was McDaniel aware of their lack of commitment? Where did the money come from that McDaniel used to repay the loans that banks were suing her over? Where did the $6,000 come from that McDaniel used to pay the hearing fee? Did McDaniel divert money received from Fish for the corporation to her personal use? What were the purposes and circumstances behind the loans made by Fish to McDaniel? What is McDaniel's total indebtedness to Fish and what position does that put him in concerning decisional control over James River? The list could go on.

Not only was a hearing never held to address a number of unresolved issues, the ALJ put restraints on discovery that ensured the impossibility of adequately addressing the financial qualification issues. Although we are mindful of the FCC's substantial discretion in ruling on a motion for summary decision, *see David Ortiz Radio Corp. v. FCC*, 941 F.2d at 1258, we are not satisfied that the evidentiary record—especially limited as it was by ALJ restrictions

---

3. The ALJ's refusal to allow discovery to ascertain whether McDaniel diverted funds for personal use that were paid to her by Fish for the application also appears to have been error. Such a diversion would raise candor and character issues that the FCC may wish to address on remand.

4. Appellants also argue that the Review Board has failed consider whether the new bank letter obtained by Robert Fish is an acceptable basis upon which to find James River's financial qualification. We decline to address this argument because appellants did not challenge the Fleet Bank letter before the Commission and thus they may not raise the point on appeal.

on its scope—was sufficient to resolve summarily the financial qualification issue.

### IV. MISREPRESENTATION

■ Appellants argue that the FCC erred in not enlarging the issues to determine. whether McDaniel had been guilty of misrepresentation and/or a lack of candor. Appellants tried on a number of occasions to open the issue of misrepresentations by McDaniel about James River's financial affairs, but the ALJ, with the FCC's approval, refused to open the issue. We conclude that these decisions by the FCC refusing to open the issue of misrepresentation were collectively in error.

When the original stock certificates were issued, they bore the notation "fully paid and non-assessable," and McDaniel introduced these certificates as true and correct. However, it was later discovered that the Charitys did not pay for their stock for almost a year after the certificates were issued and that McDaniel never fully paid for her stock. There is no evidence in the record that Kyles ever paid for his shares.

As noted, McDaniel also told three significantly different and conflicting stories about payment for her stock, which appellants correctly describe as irreconcilable. We are not necessarily persuaded by appellants' suggestion that the last version is probably the truth and that "the two previous stories were contrived to 'cover up' the fact that McDaniel did not pay for her stock and that the Drs. Charity did not pay for their stock for nearly a year after the filing of the application." Appellants' Br. at 44. But we agree that the stock certificates themselves bespeak misrepresentation because they were labeled "fully paid and non-assessable" when this was clearly not the case. And we find unsupportable the ALJ's conclusion that three stories as factually distinct as these are simply the result of memory lapse. At the very least, the question warranted a hearing.

The FCC asserts that even if appellants have shown what could reasonably be construed as inconsistency, they have not presented any factual evidence that the inconsistency involved an intent to deceive—an essential element of a misrepresentation or lack of candor showing. *See, e.g., WHW Enters., Inc. v. FCC,* 753 F.2d 1132, 1139 (D.C.Cir.1985); *Intercontinental Radio, Inc.,* 98 F.C.C.2d 608, 639 (Rev.Bd.1984) ("[O]missions or inconsistencies' unaccompanied by evidence of a 'willingness to deceive' are not a cause for action."), *modified on other grounds,* 57 Rad.Reg.2d (P & F) 1616 (F.C.C.1985) (citation omitted). But the FCC puts appellants in a Catch–22 situation. Appellants have not been able to establish whether there was an intent to deceive because an issue has not been allowed, but an issue has not been allowed because they have not established an intent to deceive. Joseph Heller himself could not have fashioned a tidier dilemma.

The FCC concludes that because this Court has held that questions about misrepresentations of facts are questions peculiarly within the province of the Commission to consider, *WEBR, Inc. v. FCC,* 420 F.2d 158, 164 (D.C.Cir.1969), this Court should not interfere with the ALJ's reasonable conclusion that McDaniel lacked an intention to deceive and that therefore no misrepresentation or lack of candor issue was warranted. The FCC has failed to come to grips with the scope of the misrepresentation issue alleged by appellants. The FCC is satisfied that the Charitys and McDaniel were always "committed, willing and able to pay for the stock," but this is not responsive to the misrepresentation issue. On their face, the stock certificates declare that they had been paid for, when in fact they had not. This fact, together with McDaniel's conflicting stories, raises a genuine issue concerning whether McDaniel's stories were purposeful misrepresentations as opposed to memory lapses. The misrepresentations alleged concerning the stock certificates are germane to a determination of whether James River was continuously financially qualified. By failing to entertain and conduct a hearing on the misrepresentation issue, the ALJ could not adequately address the financial qualification issue.

### V. *DE FACTO* CONTROL/REAL PARTY-IN-INTEREST

■ Appellants maintain that the Commission erred in failing to enlarge the is-

sues to determine whether the wealthy non-voting shareholder, Robert Fish, had become the real party-in-interest in the James River application. Appellants argue that when Fish acquired all the non-voting stock in James River he took *de facto* control of the partnership, and that as a result James River should not receive a 100% integration credit. Appellants note that when Fish acquired the stock, McDaniel was impecunious. Appellants believe Fish's control was confirmed when the series of confession of judgment notes were "extracted" from McDaniel, which he could call at any time. Appellants also point out that Fish "boasted" that he had obtained a bank letter of credit for the corporation, establishing its financial qualification as an applicant, and that the letter would never have been issued without his intervention. Most significantly, some James River bills were sent directly to his home or office, and he paid those bills himself, without going through, or even consulting, McDaniel.

The FCC responds that McDaniel has *de jure* control of the corporation. In support of its contention, the FCC cites an agreement between Fish and McDaniel which states that McDaniel "shall be responsible for the prosecution" of the application and that Fish "will not serve as either an officer or director of the Corporation," will not be "permitted to participate in the management or operation of the Corporation's business as an employee, consultant, or in other capacity," and "will not be retained to perform services of any sort for or on behalf of the Corporation." *Weyburn Broadcasting Ltd. Partnership*, No. FCC 90–1738, slip op. (A.L.J. released June 20, 1990).

In refusing to allow the financial control issue, the FCC appears to have acted inconsistently with its own precedents, as well as the precedents of this Circuit. In *Astroline Communications Co. v. FCC*, 857 F.2d 1556 (D.C.Cir.1988), we stated that "[t]he Commission's real party-in-interest inquiry typically focuses on whether a third person 'has an ownership interest, or will be in a position to actually or potentially control the operation of the station.' " *Id.*

at 1564 (quoting *Arnold L. Chase and Chase Broadcasting, Inc.*, 61 Rad.Reg.2d (P & F) 111, at ¶ 44 (F.C.C.1986)). The FCC's fixation on *de jure* control is both inappropriate and uncharacteristic. The FCC has frequently held that a question of financial control arises when a relatively impecunious individual relies upon a wealthy individual in applying to acquire or construct a radio or television station, especially when the individual supplying the funds is a broadcaster. For example, in *Pueblo Radio Broadcasting Serv.*, 5 F.C.C.R. 4829 (Rev.Bd.1990), the Board denied a full integration credit to an applicant whose nonvoting stockholder had signature authority on the checking account and had written checks to pay bills. There the Commission found that

> several post-organizational actions by the limited partners, including paying bills of the applicant, "go beyond the permissible functions of limited partners and are sufficient in themselves ... to support the conclusion that the general partners would not be the only active, controlling owners."

*Id.* at 4832 (quoting *Coast TV*, 4 F.C.C.R. 1786, 1787 (1989)). The circumstances in *Pueblo* are uncannily similar to those here, but the FCC reached an opposite outcome.

The recognition that finances and control are closely linked extends back at least fifty years to *Heitmeyer v. FCC*, 95 F.2d 91, 99 (D.C.Cir.1937), where we held that:

> It is well known that one of the most powerful and effective methods of control of any business ... is the control of its finances.
> [The] burden is and should be upon the applicant to satisfy the Commission, not only that he has financial ability to construct and operate a station, but financial ability to construct and operate it free of control, direct or indirect by any person within the classes proscribed by the [Communications Act].

*See also Benito B. Rish, M.D.*, 6 F.C.C.R. 2628 (1991) (*inter alia*, "finances can demonstrate that control has been relinquished to another unauthorized person"); *Sound Broadcasting Co.*, 6 F.C.C.R. 3626 (Rev.

Bd.1991); *Rayne Broadcasting Co., Inc.*, 5 F.C.C.R. 3350 (Rev.Bd.1990); *Seven Hills Television Co.*, 2 F.C.C.R. 6867, 6880 (Rev. Bd.1987) (power of purse is power to control); *Perry Television, Inc.*, 5 F.C.C.R. 1667 (Rev.Bd.1990).

The FCC thus departed from its precedents in refusing to enlarge the issues as to the real party-in-interest. That issue is closely related to the financial qualification and misrepresentation issues discussed previously. Because an adequate appraisal of the financial qualification and misrepresentation issues necessitates a consideration of the real party-in-interest issue, the real party-in-interest issue warranted a full hearing as well.

## VI. THE VOTE–SELLING ISSUE

■ Appellants allege that the ALJ erred in refusing to hear an issue as to whether McDaniel had sold her vote on the Richmond City Council in order to obtain the Charitys' financial backing for the James River application. According to appellants, McDaniel testified that the Charitys invested money in James River because they wanted her "help" with a medical building they hoped to build. They note that after the Charitys invested in James River, McDaniel voted for an ordinance allowing the construction of a medical building by the Charitys. The commonwealth's attorney in Richmond filed criminal warrants, which were later dropped, against McDaniel alleging that she violated Virginia's conflict-of-interest laws by accepting a loan from the Charitys.

Appellants acknowledge that only broadcast-related conduct can be the subject of a character issue. *See* FCC's *Policy Regarding Character Qualifications in Broadcast Licensing*, 59 Rad.Reg.2d (P & F) 801 (F.C.C.1986). They also acknowledge that after McDaniel was defeated for re-election to the city council the criminal warrants were dropped. Appellants nevertheless maintain that to the extent there was a connection between McDaniel's vote on the zoning for the medical building and the Charitys' financial backing in James River's application, McDaniel's conduct was "broadcast related" and should have been the subject of inquiry.

We find that the Review Board's denial of the vote-selling issue is not properly before us. When Benns requested the inclusion of the vote-selling issue, the Review Board ruled that the allegations Benns sought to explore were more appropriate for litigation in the state or local courts. *Remand Order*, 5 F.C.C.R. at 863; J.A. at 44. Because appellants did not seek review of the Review Board's ruling before the Commission, the issue is not properly before this Court. *See Rogers Radio Communications Servs., Inc. v. FCC*, 751 F.2d 408, 413 n. 14 (D.C.Cir.1985) (because appellant failed to appeal a Review Board ruling to the Commission, it failed to exhaust administrative remedies, and therefore, the Review Board's determination is not properly before the Court).

## VII. INCONSISTENT TREATMENT OF WEYBURN AND JAMES RIVER

Weyburn argues in its separate brief that the FCC acted arbitrarily and capriciously in denying it an integration credit, in part because it received treatment that was inconsistent with the treatment James River received. Weyburn's argument that it was entitled to a full integration credit appears weak, although its argument that its application was not treated consistently is a bit stronger. Because the remand ordered in this case may change the relative positions of the applicants, we will not at this time decide whether Weyburn received fair and lawful treatment by the FCC. The FCC on remand may want to reconsider Weyburn's claims as a part of its effort to resolve without caprice the assorted issues in this licensing competition.

## VIII. CONCLUSION

We conclude that the FCC's treatment of the financial qualification, misrepresentation, and real party-in-interest issues does not satisfy the standard of reasoned decisionmaking set forth in the Administrative Procedure Act. Although the level of def-

erence due administrative adjudicative deci-sionmaking is very high, it is clear that the FCC did not deal adequately with these important issues. Thus, as to the three issues enumerated above, this proceeding is remanded to the Commission for further proceedings consistent with this opinion.

*So ordered.*

MIKVA, Chief Judge, dissenting:

The panel today uses a garden variety comparative hearing, granting a construction permit for a new FM radio station in Richmond, Virginia, to take an important and dangerous incursion into the realm of administrative agency discretion. The panel acts as if this court were a Supreme Federal Communications Commission, mandated to review every jot and tittle of the Commission's procedures and factual findings. In the process, the panel fails to accord the proper deference due to an agency, and ignores and misinterprets relevant precedent of the Commission and this court. I would uphold the agency determination, and therefore dissent from the court's decision.

Regrettably, because the panel's opinion overturns the Commission's evidentiary procedures and findings, I must necessarily recite the specifics in considerable detail. Weyburn Broadcasting, the unsuccessful and unhappy contestant for the application in question, was one of 35 applicants to seek this license. It was given not one, but *two* hearings before an administrative law judge. It was given not one, but *two* hearings before the Commission's Review Board. Some of these hearings were "paper hearings," while others involved the taking of live testimony. The Commission itself ultimately affirmed the decision of its Review Board to grant the license to James River, and the court today overturns that decision.

The court now decides that the ALJ and the Review Board did not allow enough discovery or enough live testimony on the issues and remands for further proceedings. The initial hearing before the ALJ was almost five years ago. For this court to add to the unseemly delay in getting this FM facility on the air is most unfortunate. For the court to do so on the basis of challenges to the agency's factual conclusions is of still greater concern. And for the court to mandate to the Commission how its own precedents are to be aligned is the final assault on the doctrine of deference to agency decisions.

\* \* \* \* \* \*

The panel's conclusion that the ALJ erred in granting summary decision is premised on a fundamental misapplication of the FCC's prior decisions and the precedents of this court. The panel correctly states, *Majority op.* at 1223, that an applicant is financially qualified if she has "reasonable assurance" of sufficient financial resources to *build* the station, and to *operate* it for the first three months without relying on station revenue. *Financial Qualification Standards for Aural Broadcasting Applicants,* 69 F.C.C.2d 407, 408 (1978) (emphasis added). Having laid out this general definition, the panel ignores a long line of FCC decisions, cited by the ALJ below and raised again by the agency before this court, holding that a projection of total prosecution expenses *need not* be taken into account in determining the applicant's financial ability to construct and operate the proposed station where an applicant has shown itself willing and able to pay such expenses on a current basis. *See Port Huron Family Radio, Inc.,* 5 F.C.C.R. 4562, 4563 (1990); *Northampton Media Associates,* 3 F.C.C.R. 5164, 5167 (Rev.Bd.1988), *review denied,* 4 F.C.C.R. 3858 (1989), *aff'd on other grounds, Northampton Media Associates v. F.C.C.,* 941 F.2d 1214 (D.C.Cir.1991); *Muncie Broadcasting Corp.,* 54 Rad. Reg.2d 42, 46–47 (1983); *Zia Tele-Communications, Inc.,* 50 F.C.C.2d 182, 187–89 (Rev.Bd.1974). The ALJ found that James River was willing and able to pay prosecution expenses on an ongoing basis, and that such expenses should therefore not be considered in resolving the financial qualification issue.

Notwithstanding the agreed-upon definition of "financially qualified" just stated, and the ALJ's findings and rationale, the

panel rejects the ALJ's resolution of the financial qualification issue by focusing almost exclusively on *prosecution* expenses, such as legal costs and hearing fees, rather than *construction and operation costs*. For instance, the panel concludes that James River did not have a workable financial plan because the plan did not include *legal costs*, and because the Drs. Charity and Ms. McDaniel had no meeting of the minds on the *costs of prosecuting* the application. *Majority op.* at 1229. The opinion goes to some lengths to explain why this Court's decision in *Northampton Media Associates*, 941 F.2d 1214 (D.C.Cir. 1991), does not relieve an applicant of the responsibility to assure itself of reliable financial support. That straw man is functionless. The ALJ never concluded, and the Commission does not argue, that James River did not have an obligation to assure itself that it was financially qualified. Rather, the FCC maintains that *prosecution expenses* need not be considered in the agency's calculus because they were being paid on an ongoing basis—a position squarely consistent with agency practice. The majority is correct that the FCC *may* take such expenses into account in some circumstances, see Majority op. at 1229 n. 1, but the Commission did not err in choosing not to do so in this case.

The panel's attack on the other alleged errors in the ALJ's resolution of the financial qualification issue is equally misplaced. None of the issues bears on James River's financial qualification, except insofar as they are germane to James River's ability and willingness to pay prosecution expenses—the threshold issue, discussed below, that the panel completely fails to address. The proceeds of the stock sales were never intended to cover construction and operation costs, and are therefore irrelevant to financial qualification. Whether the stock subscriptions were timely paid is relevant only to the misrepresentation issue, also discussed below. The cash payment of the hearing fee involves a prosecution expense that was undeniably paid, and is therefore similarly irrelevant to financial qualification. The source of the funds used to pay the hearing fee, like the possible existence of a loan from the Charitys to Ms. McDaniel, is relevant only to a real party-in-interest issue *involving the Drs. Charity*. But the only real party-in-interest issue raised by Weyburn was with respect to Mr. Fish. Thus, these final two points are not pertinent to any of the issues raised in this appeal. I recite all of this evidentiary trivia not only because it forms the gravamen of the majority's decision, but also because it vivifies the nit-picking that forms my objection to the decision.

\*      \*      \*      \*      \*      \*

As discussed above, prosecution expenses are generally not taken into account in determining an applicant's financial qualification if the applicant has shown itself willing and able to pay such expenses on an ongoing basis. The panel provides virtually no basis for rejecting the ALJ's finding that James River satisfied this threshold condition, and that prosecution expenses should therefore be excluded from the financial qualification inquiry. In its detailed exegesis of the six "reversible errors" committed by the ALJ, the panel offers only two points that are even *relevant* to this inquiry. The panel states that "the corporation's bills went unpaid and its attorney withdrew for non-payment," *Majority op.* at 1230, and that there was some evidence that the Drs. Charity's "interest was waning" with respect to the continued prosecution of the application. *Id.* at 1231.

The contention that the ALJ's treatment of these issues did not meet the standard of reasoned decisionmaking set out in the Administrative Procedure Act ("APA") distorts the record and stands the principles of judicial deference embodied in the APA on their head. The ALJ made the following findings on remand with respect to the payment of legal fees:

[A]lthough legal fees have not always been paid promptly, the applicant has paid its prosecution expenses. Moreover, at the time counsel withdrew from the case ... the James River account was in arrears for only a two month period and by only $7,853.50. The *de minimis* amount in arrears pales into insignificance when measured by the fact

that James River had paid over $150,000 in legal fees to date.

*Supplementary Order,* 5 F.C.C.R. 3812, 3814 (ALJ 1990).

The record establishes that James River did not borrow money from its source of financing for construction and initial operating expenses ... to pay its legal fees. Rather, it paid its legal fees on an on-going basis from either the principal's own or the corporation's accounts. Thus, the money available for construction and initial operation, the legal standard for being financially qualified, has never been adversely affected. Although during part of the year 1986 certain legal fees were not paid on a timely basis, the fact is that by December of 1985 $4,629 of a total bill of $5,274.88 was paid bringing the account close to current; and repeatedly thereafter, the account has been brought current usually within a month or two of billing. Furthermore, the account is now and has been for several months current and the applicant has paid over $150,000 in legal fees to date, proving its financial mettle.

*Memorandum Opinion and Order,* 90M-1738, at 2 (ALJ June 20, 1990). The ALJ reviewed the entire history of the legal fees payments and concluded that the facts did not indicate an unwillingness or inability to pay prosecution expenses on an ongoing basis. The panel might disagree with the ALJ's conclusion. But it strains credulity to maintain that the ALJ's finding is unsupported by substantial evidence on the record, manifests a lack of reasoned decisionmaking, or is otherwise arbitrary and capricious. The panel offers no convincing reason not to accord the customary judicial deference due agency findings of fact and agency interpretations of their own regulations and precedents.

The panel's contention that further hearing is required to resolve the question of whether the Drs. Charity's "interest was waning," *Majority op.* at 1231, suffers from the same fundamental failure to defer to the Commission's findings when supported by substantial record evidence. The panel acknowledges that "[t]he ALJ and the Commission are responsive to the question whether the Charitys remained financially able to meet their commitment...." *Id.* Thus, the panel concedes that the ALJ adequately considered the collapse of the medical building and the Bank of Virginia letter of assurance. Further hearing is nonetheless required, the panel concludes, because "the Charitys' willingness to [meet their financial commitment] remains in greater doubt." *Id.*

The panel cannot seriously suggest that a hearing is required whenever there is any smidgeon of evidence that an investor's "interest was waning," especially when that investor has already laid out over $150,000 in prosecution expenses. The ALJ's decision that the Charitys were willing to pay prosecution expenses is amply supported on the record in this case. As to the temporary withdrawal of counsel, the slender reed upon which the panel rests its remand, the ALJ found that the Drs. Charity were not immediately aware of the situation because they were deliberately insulated from the day-to-day affairs of the proposed station in accordance with James River's representation that Ms. McDaniel would exercise sole control over the proposed station. *Supplementary Summary Decision,* 5 F.C.C.R. at 3814. In any event, counsel reinstated himself, and the prosecution expenses were current at the critical times.

\*     \*     \*     \*     \*     \*

The panel's treatment of the misrepresentation issue suffers from the same lack of deference pervasive in their opinion. Ms. McDaniel did tell three substantially different stories regarding payment for her stock, and a reading of the cold record provides some support for the panel's concern that Ms. McDaniel was dishonest, rather than simply confused or forgetful. However, this Court does not review the Commission's findings of fact *de novo.* The misrepresentation issue is a factual question on which the FCC is entitled to substantial deference, especially in light of the need in this instance to assess the credibility of witnesses. The ALJ found that

McDaniel and William D. Bayliss, James River's Secretary and local lawyer, were unsure of when stock was paid for as well as other corporate niceties. There is no evidence of deliberate falsification or lack of candor. It is clear to the Presiding Judge *who observed the demeanor of McDaniel and Bayliss* and upon review of the deposition and hearing testimony that the failure to recall precisely all the details attendant to the formation of the corporation can be ascribed solely to the loss of memory of events 3 or more years vintage. Benns has offered no evidence of intentional deception and the Presiding Judge finds the complete absence of such evidence.

*Memorandum Opinion and Order*, 90M–1737, at 4 (ALJ June 20, 1990) (emphasis added). The panel, which never saw Mr. Bayliss or Ms. McDaniel, must have a different "appellate" position as to the witnesses' demeanor. Furthermore, the panel's contention that the Commission "has failed to come to grips with the scope of the misrepresentation issue," *Majority op.* at 1232, is based on the inaccurate and misleading assertion that the ALJ responded to the issue *only* with respect to the willingness and ability to pay for the stock. The panel simply ignores the ALJ finding, quoted above, that goes directly to the issue of intent to deceive.

The "Catch–22" that the panel discerns in the ALJ's refusal to allow a misrepresentation issue is a complete mirage. The panel implies that Weyburn was unable to establish an intent to deceive because no evidence was allowed on the issue. But at the time the ALJ made his final decision, he had before him *three separate depositions and a transcript from live testimony delivered in his presence.* Weyburn was given ample opportunity to adduce evidence of an intent to deceive. The ALJ did not act irrationally or abuse his discretion in concluding that the discrepancies in Ms. McDaniel's explanation of the stock transactions did not demonstrate the requisite intent to deceive. The ALJ made findings based on eyeball testimony that ought not be cavalierly trumped by an appellate court's suspicions.

Finally, contrary to the panel's conclusion, the stock subscriptions are of little consequence to the financial qualification of James River. As discussed earlier, I do not believe that the ALJ erred in finding that prosecution expenses were paid on an ongoing basis; whether the very modest proceeds of the arguably unpaid stock subscriptions were actually available does not disturb this finding. The proceeds are even more insignificant with respect to the availability of construction and initial operation costs, which were estimated in the hundreds of thousands of dollars and which were guaranteed by loan assurances that the panel opinion does not assail.

\*    \*    \*    \*    \*    \*

The final grounds upon which the panel rests its remand is the Commission's refusal to allow a real party-in-interest issue with respect to Mr. Fish. The panel incorrectly states that the FCC's sole rationale was that Ms. McDaniel had *de jure* control over James River. *Majority op.* at 1233. In fact, the ALJ squarely addressed the question of whether Mr. Fish exercised *de facto* control. Weyburn's claim that Mr. Fish was in actual control of the application was founded on the fact that he paid some of the bills for prosecution expenses, that he held promissory notes against Ms. McDaniel, and that he took an active role in obtaining the bank letter from Fleet National Bank (there was conflicting testimony on this last point). The ALJ reasonably found that Mr. Fish did not play a substantial role in the day-to-day affairs of James River, and that the facts raised by Weyburn did not establish that Mr. Fish exercised or even attempted to exercise control over the prosecution of James River's application. The precedents cited by the panel, *Majority op.* at 1233–1234, from which they claim the Commission has strayed in this case, involve considerable additional indicia of control beyond mere payment of expenses. Moreover, the prior cases involved control by a third party over the *applicant's* account, not over a *personal* account used to pay prosecution costs. The latter sort of control is completely consistent with an arrangement whereby

non-voting participants in the application agree to pay a portion of the applicant's prosecution expenses.

\* \* \* \* \* \*

The panel's opinion reviews the FCC's proceedings in this case with a fine tooth comb—making judgments about the credibility of witnesses we have never seen, chastising the agency for failing to allow more discovery or more hearings, and refusing to defer to agency findings that are reasonable and supported by substantial record evidence. If the panel's exacting standard were systematically imposed by this court, the Commission would be compelled to hear all witnesses, and designate all issues, all of the time. Summary adjudication of issues would become impossible. How the Commission would handle its case load (and how we would handle our reviewing case load) would be a serious concern. We have been told many times by the Supreme Court, and have many times reminded parties before us, that our role is far more limited. We ought to let administrative agencies be administrative agencies. I dissent.