**DAVID ORTIZ RADIO CORPORATION,**
Appellant,

v.

**FEDERAL COMMUNICATIONS
COMMISSION, Appellee,**

**Ramon Rodriguez and Associates,
Incorporated, Intervenor.**

No. 90–1412.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 22, 1991.

Decided Aug. 20, 1991.

Robert A. DePont, Washington, D.C., for appellant.

Sue Ann Kanter, Counsel, F.C.C., with whom Robert L. Pettit, Gen. Counsel, F.C.C., and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on the brief, for appellee. Roberta L. Cook, Counsel, F.C.C., Washington, D.C., also entered an appearance, for appellee.

Christopher D. Imlay, Washington, D.C., was on the brief, for intervenor.

Before BUCKLEY, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

During preliminary proceedings for a broadcast license, two applicants accused a third of potentially disqualifying skullduggery involving misrepresentation, concealment of material facts, and abuse of process. Without convening hearings, the Federal Communications Commission found the allegations to be without merit, and it ultimately awarded the license to the alleged wrongdoer. Because the FCC skated past the accusers' central arguments and misapplied its own policy concerning character qualifications, we remand.

I. BACKGROUND

This proceeding involves the award of a construction permit for a newly authorized

FM radio channel serving southwest Puerto Rico. The first applicant, David Ortiz Radio Corporation ("Ortiz"), proposed to transmit from Cerro Guaniquilla. Ortiz had actually secured permission to use a hill about half a mile from Cerro Guaniquilla. Upon discovering the error and the unavailability of the originally designated site, Ortiz located an alternative site and filed an amended application. The FCC found no intent to deceive and accepted the amendment. The Commission ultimately granted the license to Ramon Rodriguez & Associates, Inc. ("RRAI").

Ortiz challenges the licensing decision on three bases: (1) In its license application, RRAI falsely certified that it had reasonable assurance of a transmitter site; (2) RRAI subsequently concealed its lack of a site from the Commission for over seven months; and (3) seeking information with which to discredit Ortiz, an RRAI principal abused the Commission's process by posing as an FCC official.

A. Transmitter Site-related Charges

On December 8, 1982, RRAI applied for the license and, like Ortiz, listed Cerro Guaniquilla as its transmitter site. In March 1983, RRAI submitted an amendment in which it reaffirmed its intention to transmit from that site; it withdrew that amendment in July and submitted an amendment listing a different site in August. These facts led other applicants to charge RRAI with misrepresenting the status of its transmitter site in the application and with concealing its site problems from the FCC thereafter.

One of the applicants, F.M. Minority Broadcasting, filed a Petition to Enlarge the Issues in July 1987, in which it moved that the Commission consider the misrepresentation charge and determine in the light of it whether RRAI had "the minimum qualifications of character" to receive a license. Joint Appendix ("J.A.") 172–73. RRAI responded with an affidavit from its principal shareholder, Ramon Rodriguez, dated July 21, 1987 ("July 1987 affidavit"). He explained that the application listed Cerro Guaniquilla because he had learned

that it was the site selected by Ortiz, understood that it belonged to the government of Puerto Rico, and believed "to the best of my layman's knowledge [that] if the land was government owned and available to Mr. Ortiz, it was to be available to us also." J.A. 192.

According to the affidavit, Rodriguez applied for a land-use permit and paid a filing fee at the Puerto Rico Department of Natural Resources in November 1982. In a letter dated December 3, the agency responded that the government did not own the land. From additional inquiries, Rodriguez learned that the land actually belonged to a different government agency, the Conservation Trust of Puerto Rico; the Trust, however, denied Rodriguez's request to erect a transmitter tower. The affidavit states that RRAI

[i]mmediately ... moved to start looking for another site which, after many efforts [on] our part, we found in "Penones de Melones"; and [on] June 14, 1983 we received a letter from the owners telling us that they were in agreement to rent the land to us....

We then, on June 29, 1983, prepared and filed an amendment to change the original site before the Federal Communication[s] Commission, and it is the one that we have at this moment.

J.A. 193.

F.M. Minority termed the RRAI filing "a litany of misrepresentation and lack of candor." J.A. 210. It noted, among other things, that RRAI had not informed the FCC of its new site on June 29, 1983, as the Rodriguez affidavit indicated. Although the engineering documents bore that date, the amendment was not submitted until August 26. F.M. Minority had originally sought a hearing on whether the RRAI application contained a misrepresentation; now, in light of RRAI's tardiness in disclosing its site problems, it amended the petition to include the issue of post-application concealment as well.

In February 1988, the ALJ added the misrepresentation issue but said nothing about concealment. J.A. 239. F.M. Minority submitted a "motion for clarification"

that asked about the concealment issue. The motion contended that RRAI had known it had been without a site since early December 1982, but had waited eight months before apprising the FCC of the fact, and that during that period, RRAI had submitted two documents to the FCC—a March 1983 amendment and a July letter withdrawing it—that continued to list the original location as the proposed transmitter site. In light of these communications, F.M. Minority urged the FCC to investigate whether RRAI had "misrepresented, concealed or was lacking in candor," J.A. 253, and whether RRAI had violated an FCC regulation requiring applicants to inform the Commission "as promptly as possible and in any event within 30 days" if the information in the pending application "is no longer substantially accurate and complete in all significant respects," 47 C.F.R. § 1.65(a) (1990). On April 13, 1988, the ALJ denied the motion as an untimely attempt to enlarge the issues. He also noted that the facts demonstrated "no undue delay by Rodriguez in finding and amending to a new site once he discovered that the government site was unavailable." J.A. 415.

Although the ALJ had refused to add the concealment issue, the misrepresentation issue remained. Rodriguez gave a deposition on April 26 and filed an affidavit on May 2 ("May 1988 affidavit"). Whereas in his earlier affidavit he had spoken of his "layman's knowledge" about the availability of a government-owned site, he now said he had consulted an attorney. He also disclosed when he first learned there was a problem with the Guaniquilla site, and when he was advised of its unavailability: He said he had received the December 3, 1982, letter from the Department of Natural Resources disclaiming government ownership of the property on December 8— coincidentally, the day that the RRAI application was filed with the FCC in Washington—and that the Conservation Trust had denied him the site on January 10, 1983. After discovery but before the planned hearing, RRAI moved for summary judgment on the issue. In July 1988, the ALJ granted the motion. He said he found no

evidence that RRAI had intended to deceive the FCC and noted that intent is a necessary element of misrepresentation.

Having disposed of the misrepresentation issue, and F.M. Minority having withdrawn its application, the ALJ proceeded with a comparison of the remaining applicants, RRAI and Ortiz. Although the ALJ found that both were qualified, he awarded the license to RRAI because Ortiz already owned an AM station in the area. *Ramon Rodriguez*, 4 F.C.C. Rcd. 370, 374–75 (1989).

On administrative appeal, Ortiz contested the ALJ's handling of the misrepresentation and concealment issues. The Review Board affirmed both rulings on the ground that no evidence showed that RRAI had acted in bad faith. 4 F.C.C. Rcd. 6817, 6817–18 (Rev.Bd.1989). The Board added that RRAI's delay in reporting its site problems might once have resulted in a comparative demerit, but the FCC had stopped considering issues of character in its comparative analyses; thus "this option is no longer available to us." *Id.* at 6818 (citing *Policy Regarding Character Qualifications in Broadcast Licensing*, 102 F.C.C.2d 1179, 1230–32 (1986) (*"Character Qualifications"*), *amended,* 5 F.C.C. Rcd. 3252 (1990)). The FCC denied review without discussing the site-related issues. 5 F.C.C. Rcd. 4041 (1990).

**B. Abuse of Process Charge**

In April 1988, Ortiz filed a motion to add an abuse-of-process issue against RRAI. Of the allegations in the motion, one is preserved on appeal: Ortiz's claim that Juan Rodriguez, a one percent owner of RRAI and the son of principal owner Ramon Rodriguez, had tried to pass himself off as an FCC inspector.

Ortiz submitted an affidavit by Carlos Ortiz Postigo, owner of Carlitos Photo Store, who gave the following account. In February 1988, Juan Rodriguez asked him to photograph the transmitter used by Ortiz's AM station. When Rodriguez admitted that he did not have Ortiz's permission, the photographer refused. Rodriguez later returned and said that he was from the

FCC and wanted to ask about the Ortiz station and about an FM station licensed to the daughter of Ortiz Corporation president David Ortiz. The photographer demanded official identification and, when Rodriguez could not produce any, refused to answer his questions.

RRAI responded with an affidavit from Juan Rodriguez, who swore that he had never identified himself as an FCC employee, that he would never do such a thing because it would tarnish his "sound and moral image" as a singer in "the famous Andino's Trio," that he had in fact announced that he was representing RRAI and that he was a member of the renowned trio, and that the photographer had recognized him. J.A. 432. RRAI also submitted the affidavit of Juan Esquerdo, who said that he had accompanied Rodriguez to the photographer's shop and that the Rodriguez affidavit was accurate. Ortiz responded with a second affidavit from the photographer, who stood by his original account and said he had never heard of Andino's Trio.

The FCC refused to add the issue. The ALJ noted that no extrinsic proof had been offered and concluded that "it would serve no purpose to explore" the matter because the conflicting affidavits amounted to a standoff. J.A. 598. The Review Board affirmed. It stressed that impersonating an FCC agent was a crime, and that under the Commission's *Character Qualifications* policy, such a charge would not be considered absent a conviction. 4 F.C.C. Rcd. at 6818. The Board also noted that Juan Rodriguez was a minor shareholder, that he denied the allegation, and that his account was supported by a third party. *Id.* The Commission denied review without discussing the issue. 5 F.C.C. Rcd. at 4041.

## II. Discussion

### A. Legal Standards

■ The Communications Act provides:

If ... a substantial and material question of fact is presented ..., [the Commission] shall formally designate the ap-

plication for hearing on the ground or reasons then obtaining.... Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate.

47 U.S.C. § 309(e) (1988). Before the FCC will hold a hearing, the "dispute must be clearly and adequately alleged, it must be factual, and it must rise to the level of a substantial and material issue." *California Public Broadcasting Forum v. FCC,* 752 F.2d 670, 674 (D.C.Cir.1985); *see also Citizens for Jazz on WRVR, Inc. v. FCC,* 775 F.2d 392, 394–95 (D.C.Cir.1985). In reviewing the FCC's denial of a requested hearing, we play only a "limited" role, for "the Commission's discretion and expertise [are] paramount" in this sphere. *Gencom Inc. v. FCC,* 832 F.2d 171, 181 (D.C.Cir. 1987) (internal quotes and citations omitted). "We will not, however, hesitate to intervene where the agency decision appears unreasonable or bears inadequate relation to the facts on which it is purportedly based." *California Public Broadcasting,* 752 F.2d at 675.

### B. The Misrepresentation Issue

The first issue presented was whether RRAI's application had misrepresented the status of its transmitter site. The ALJ added the issue but resolved it in RRAI's favor without a hearing, and the Review Board affirmed. Ortiz argues that this disposition is erroneous both substantively and procedurally.

#### 1. Misrepresentation of reasonable assurance

■ An applicant must have "reasonable assurance" that the transmitter site specified in its application will be available. *Mount Wilson FM Broadcasters, Inc. v. FCC,* 884 F.2d 1462, 1463 (D.C.Cir.1989). The standard, "a liberal one," is satisfied by

some clear indication from the landowner that he is amenable to entering into a future arrangement with the applicant for use of the property as its transmitter site, on terms to be negotiated, and that

he would give notice of any change of intention.

*Elijah Broadcasting Corp.*, 5 F.C.C. Rcd. 5350, 5351 (1990). Where the landowner is a government agency, its "mere willingness ... to entertain a request for use of the land" will suffice. *Alden Communications Corp.*, 3 F.C.C. Rcd. 3937, 3938 (1988). An applicant will be disqualified for misrepresentation only upon "substantial evidence of an intent to deceive." *Armando Garcia*, 3 F.C.C. Rcd. 1065, 1067 (Rev. Bd.), *rev. denied*, 3 F.C.C. Rcd. 4767 (1988).

In affirming the ALJ's summary decision, the Review Board explained:

> [I]t appears from Rodriguez's uncontradicted affidavit and sworn deposition testimony that he proceeded in good faith in specifying a site on the basis of his knowledge that Ortiz had selected the same site, on his conversations with government personnel, on advice from legal counsel, and on his payment of a filing fee. Only after these steps were taken and the application was filed did he learn of the site's unavailability.

4 F.C.C. Rcd. at 6817. The Board added that absent evidence of bad faith, "no genuine issue of misrepresentation ... remained to be tried." *Id.* at 6817–18.

 On appeal, Ortiz notes that Rodriguez initially spoke of his "layman's knowledge" about government permits, but later claimed that he had consulted a lawyer. Although the Board mentioned this consultation, along with the other steps Rodriguez said he had taken before filing, we have no reason to believe that the Board relied on this particular assertion in finding that RRAI had acted in good faith. The Board was certainly aware of the discrepancy between Rodriquez's first and final representations, and apparently did not find it significant. Nor do we. As Ortiz has given us no better basis for overturning the Commission's findings and conclusions, we leave this portion of the decision undisturbed.

### 2. Summary dismissal

 Ortiz also faults the ALJ for dismissing the issue without a hearing. To defeat a motion for summary decision, a petitioner

> may not rest upon mere allegations or denials but must show, by affidavit or by other materials subject to consideration by the presiding officer, that there is a genuine issue of material fact for determination at the hearing[; or] that he cannot, for good cause, present by affidavit or otherwise facts essential to justify his opposition[;] or that summary decision is otherwise inappropriate.

47 C.F.R. § 1.251(b). The FCC has substantial discretion in acting on a motion for summary decision; the statutory hearing requirement "does not vouchsafe an inalienable right to cross-examination or surrebuttal." *Cellular Mobile Sys. v. FCC*, 782 F.2d 182, 197 (D.C.Cir.1985).

Ortiz neither submitted an affidavit nor explained its failure to do so; it merely suggested that the RRAI assertions were incomplete and uncorroborated and that Rodriguez had modified his story in a suspicious fashion. This was not enough for the Review Board, which concluded that "Ortiz's general objections and denials, unsupported by affidavit(s), ... did not undermine or raise serious question as to Rodriguez's *bona fides*," 4 F.C.C. Rcd. at 6817. Ortiz relies heavily on *California Public Broadcasting Forum v. FCC*, but the movant there, unlike Ortiz, produced affidavits and documentary evidence supporting its version of the disputed facts, *see* 752 F.2d at 676–77. Ortiz has failed to demonstrate that the Commission behaved arbitrarily or capriciously.

### C. The Concealment Issue

On the evidence before it, the FCC reasonably concluded that RRAI's actions concerning the transmitter site were above board up to and including the time that it submitted its license application. RRAI's post-application behavior, however, is another matter.

On December 8, 1982, the day that RRAI filed its application, it could reasonably be-

lieve that Cerro Guaniquilla would be available. But by day's end, according to his May 1988 affidavit, Rodriguez had received the letter from the Department of Natural Resources advising him (mistakenly) that the property was privately owned. Therefore, as of that moment, RRAI had no assurance of the site's availability. On January 10, 1983, the Conservation Trust denied RRAI the use of the property. Thus, RRAI's belief in the site's availability, reasonable at daybreak on December 8, became less plausible by dusk and untenable on January 10.

When he ruled that "there was no undue delay by Rodriguez in finding and amending to a new site once he discovered that the government site was unavailable," J.A. 415, the ALJ apparently did not comprehend the duration of RRAI's delay—from January 10 to August 26, seven and one-half months. In an earlier ruling, the ALJ had said that RRAI "was not advised of [Cerro Guaniquilla's] unavailability until June of 1983," J.A. 239, which was a plausible interpretation of Rodriguez's July 1987 affidavit. *See* excerpt quoted above at page 1255. The ALJ presumably continued to harbor this misconception when, on April 13, 1988, he denied the motion for clarification on the ground of "no undue delay." This is understandable, as it was not until thirteen days after that ruling that Rodriguez first acknowledged, in a deposition, that the Conservation Trust had denied his request as early as "January or February" 1983, not June. (He confirmed the January 10 date the following week in his May 1988 affidavit.)

The Review Board affirmed the ALJ on a different rationale. After noting that the ALJ had found no undue delay, the Board said:

> We agree with the ALJ that no substantial basis for a non-reporting issue was established. While Rodriguez did not report the loss of his site within thirty days (required by 47 C.F.R. § 1.65), ... no evidence was submitted to show that he acted deceptively or proceeded in bad faith either before or after he learned that his site was unavailable. In these

circumstances, the failure to timely report would have at one time resulted, perhaps, in a comparative demerit, but this option is no longer available to us. *See Character Qualifications*, 102 F.C.C.2d 1179, 1230–1232 (1986). Absent anything other than speculation and surmise to support Ortiz's claim that the omission was intended to deceive, we conclude that the ALJ's ruling was correct.

4 F.C.C. Rcd. at 6818. While the Board did not indicate that it recognized the ALJ's factual error, we may assume that it did, as Ortiz recited the disclosures contained in Rodriguez's May 1988 affidavit in its pleadings. Thus, the final agency action before us appears to be this: the Review Board's conclusion that no evidence of an intent to deceive underlies RRAI's seven-month delay.

■ Section 1.65, the reporting requirement to which the Board referred, provides:

> Each applicant is responsible for the continuing accuracy and completeness of information furnished in a pending application or in Commission proceedings involving a pending application.... [W]henever the information furnished in the pending application is no longer substantially accurate and complete in all significant respects, the applicant shall as promptly as possible and in any event within 30 days, unless good cause is shown, amend or request the amendment of his application so as to furnish such additional or corrected information as may be appropriate.

47 C.F.R. § 1.65(a). A section 1.65 violation is disqualifying only if evidence indicates that the applicant intended to conceal the information from the Commission, or if the reporting violations are so numerous and serious as to indicate irresponsibility. *See Valley Broadcasting Co.*, 4 F.C.C. Rcd. 2611, 2618 (Rev. Bd.1989).

■ Had RRAI remained silent between January 10, 1983, when it was denied the use of Cerro Guaniquilla, and August 26, when it identified its new site by amendment, any charge of deliberate con-

cealment might justly have been dismissed as mere "speculation and surmise." During that period, however, RRAI spoke twice. On March 18, 1983, about two months after Rodriguez had learned that the site was unavailable, RRAI filed an amendment. It included an engineering statement, signed and certified as accurate by RRAI's technical consultant, that listed Cerro Guaniquilla as the transmitter location. The amendment was signed by an RRAI partner, who thereby "certif[ied] that the statements in this application are true, complete, and correct to the best of my knowledge and belief, and are made in good faith." J.A. 101. And it was accompanied by a letter from RRAI's attorney, who declared that the amendment specified "the same transmitter site" as the application. J.A. 96. Then, on July 7, 1983, RRAI informed the FCC that the March 18 amendment "is hereby withdrawn, and the application as originally filed ... is to be processed." J.A. 116. This letter implies what the earlier communication stated— that Cerro Guaniquilla remained RRAI's transmitter site—and it was submitted nearly six months after RRAI learned otherwise.

We believe that these two filings potentially met the Commission's standard of "suitable evidence of an intent to conceal pertinent information from the Commission," *Valley Broadcasting*, 4 F.C.C. Rcd. at 2618, such that disqualification under section 1.65 was possible. As we have noted before, "the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity" ordinarily suffices to demonstrate fraudulent intent. *Leflore Broadcasting Co. v. FCC*, 636 F.2d 454, 462 (D.C.Cir.1980).

As affirmative misstatements, moreover, the two filings also reflected on the applicant's character. At the time, the Commission limited its interest in character to matters "clearly relevant to the licensing process." *Character Qualifications*, 102 F.C.C.2d at 1181. The Commission expressed particular concern over willful misrepresentation: It "not only violates the Commission's Rules; it also raises immediate concerns over the licensee's ability to

be truthful in any future dealings with the Commission." *Id.* at 1209. Accordingly, the FCC may "treat even the most insignificant misrepresentation as disqualifying," for " '[t]he fact of concealment may be more significant than the facts concealed.' " *Id.* at 1210 & n. 77 (quoting *FCC v. WOKO, Inc.*, 329 U.S. 223, 227, 67 S.Ct. 213, 215, 91 L.Ed. 204 (1946)). The FCC has disqualified several applicants for such offenses. *See 62 Broadcasting, Inc.*, 4 F.C.C. Rcd. 1768, 1774 (Rev. Bd.1989) (citing cases), *rev. denied*, 5 F.C.C. Rcd. 830 (1990).

Thus, the RRAI amendment and the letter withdrawing it offer plausible evidence that the applicant may have willfully withheld information from the Commission, thereby raising serious question as to "its basic qualifications to be a licensee." *Character Qualifications*, 102 F.C.C.2d at 1231. These filings were vigorously and repeatedly brought to the FCC's attention—by F.M. Minority before the ALJ, and by Ortiz before the Review Board and the Commission—and yet, astonishingly, no FCC decisionmaker so much as mentioned them. Much as we defer to the Commission's determination that a factual dispute is too insubstantial to require a hearing, "the determination must at least be *made*." *Citizens for Jazz*, 775 F.2d at 398 (emphasis in original). As the FCC evaded the requisite determination by ignoring important arguments and evidence, its decision in this regard is arbitrary and capricious, *see NRDC v. EPA*, 822 F.2d 104, 111 (D.C.Cir. 1987), and must be remanded.

### D. The Abuse of Process Issue

 Here we confront another question of character: the allegation that an RRAI co-owner, Juan Rodriguez, impersonated an FCC inspector. The Review Board affirmed the ALJ's refusal to add this issue. The Board stressed that,

insofar as Ortiz contends that the alleged impersonation would constitute a criminal violation of 18 U.S.C. 912, we observe that Ortiz has not even asserted that this matter was the subject of a criminal complaint, investigation, indictment, trial, or

judgment of any sort, let alone a conviction. In pertinent part, it is the Commission's general policy not to take cognizance of misconduct involving alleged criminal activity unless it is finally adjudicated by a court.

4 F.C.C. Rcd. at 6818.

Once again, the Review Board misconstrued the allegation and as a consequence misapplied FCC policy. It is true that the Commission "will not take cognizance of *non-FCC* misconduct involving criminally fraudulent misrepresentations ... unless it is adjudicated." *Character Qualifications,* 102 F.C.C.2d at 1205 (emphasis added). It is also true, however, that "such misconduct as ... harassment of opposing parties, which threatens the integrity of the Commission's licensing processes, will ... continue to be considered as bearing on character"; the FCC terms this misbehavior "abuse of process." *Id.* at 1211. Ortiz, while mentioning the possibility of criminal liability, argued that the impersonation amounted to "an abuse of the Commission's process ... intended to impede, frustrate or obstruct the prosecution of the Ortiz application." J.A. 671. Nevertheless, the Board treated the accusation as alleging criminal conduct unrelated to the licensing process.

In addition to the fact that the impersonation charge had not been criminally adjudicated, the Review Board cited two other points in support of its ruling. First, it noted that the allegation concerned "a very minor Rodriguez principal (Juan Carlos Rodriguez Maldonado, merely a 1% equity owner of the applicant)." 4 F.C.C. Rcd. at 6818. Rodriguez's equity interest, however, belies the magnitude of his links to RRAI. He is the son of the principal owner, Ramon Rodriguez, and he expected to become the station's full-time news director. Moreover, Juan Rodriguez admitted in an affidavit that on one occasion he initially concealed his identity while conducting an investigation on RRAI's behalf. In an effort to determine whether David Ortiz secretly controlled the station licensed to his daughter, Rodriguez visited the station and requested its public file; when asked what company he represented,

he replied that he represented none, but later identified himself as "Juan Carlos Rodriguez, of Ramon Rodriguez & Associates." J.A. 491–92. In the affidavit, Rodriguez revealed that he had undertaken this mission on his father's instructions. In light of this episode, it is hardly outlandish to suggest that the other investigation, in which the young Rodriguez allegedly posed as an FCC inspector, was also instigated by his father.

As the other factor against adding the issue, the Review Board noted that the allegation "was flatly denied by the Rodriguez principal, and his statement was supported by a third person." 4 F.C.C. Rcd. at 6818. The ALJ similarly remarked that "[s]ince the testimony submitted in support of the motion is contradicted, it would serve no useful purpose to explore because the standoff can never be resolved." J.A. 598. These statements suggest a disquieting laxity on the Commission's part. A hearing, with its cross-examination and opportunities to observe the demeanor of witnesses, can frequently resolve a conflict that appears irresolvable on paper; indeed, determining which of several conflicting accounts is accurate "is precisely the function of an evidentiary hearing." *California Public Broadcasting,* 752 F.2d at 680.

The Commission may have valid reasons for refusing to inquire into the abuse-of-process charge, but it has thus far failed to articulate them. We must therefore find that the Commission's peremptory dismissal of the abuse-of-process issue was arbitrary and capricious.

## III. Conclusion

The FCC acted within its discretion in concluding, after discovery but before a hearing, that RRAI did not misrepresent its site status when applying for the license. The Commission failed, however, to explain satisfactorily its refusal to inquire into two other allegations: that RRAI had concealed its post-application site problems from the FCC by affirmative misstatement as well as by silence; and that Juan Rodriguez, acting on behalf of RRAI, abused the

Commission's process by impersonating an FCC inspector. Accordingly, we reverse these rulings and remand for further proceedings consistent with this opinion.

*So ordered.*