46 F.3d 1154
 310 U.S.App.D.C. 237
 METROPOLITAN COUNCIL OF NAACP BRANCHES; Robert Flynn;
Hilda Rogers; Amnews Inc.; Wilbert A. Tatum, Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Lenora B. Fulani; Dr. Rafael Mendez; Frederick L. Newman;
The National Alliance; Fox Television Stations,
Inc.; The News Corporation Limited, Intervenors.
 Nos. 93-1471, 94-1039.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 4, 1994.
Decided Jan. 27, 1995.
Rehearing and Suggestion for Rehearing In Banc Denied April
24, 1995.
 
 Appeals from the Federal Communications Commission.
 Robert L. Thompson, argued the cause, and filed the briefs, for appellant Caucus, for Media Diversity.
 David E. Honig and Laura Blackburn, argued the cause, and filed the briefs, for appellants Metropolitan Council of NAACP Branches, et al.
 Daniel M. Armstrong, Associate General Counsel, F.C.C., argued the cause, for appellee. With him on the brief were William E. Kennard, General Counsel, and C. Grey Pash, Counsel, and Michael F. Finn, Counsel, F.C.C. Renee Licht entered an appearance, for appellee.
 Mace J. Rosenstein, argued the cause, for intervenors Fox Television Stations, Inc., and The News Corp. Ltd. With him on the brief, was William S. Reyner, Jr.
 Arthur R. Block filed the brief, for intervenors Lenora B. Fulani, Dr. Rafael Mendez, Frederick L. Newman, and The National Alliance.
 Before SENTELLE, RANDOLPH, and ROGERS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SENTELLE.
 SENTELLE, Circuit Judge:
 
 
 1
 The Metropolitan Council of NAACP Branches, the Caucus for Media Diversity, and various individuals (hereinafter "appellants"), appeal from a decision of the Federal Communications Commission ("FCC" or "Commission") granting Fox Television Stations, Inc. ("Fox") a permanent waiver of its ban on the cross-ownership of TV stations and newspapers in the same market in relation to the reacquisition of the New York Post newspaper by Fox's principal, Rupert Murdoch. They argue that the FCC acted in an arbitrary or capricious manner, that its decision was not supported by the record, and that certain FCC commissioners should have recused themselves. Because we conclude that none of their arguments is meritorious, the Commission's decision is affirmed.
 
 I. BACKGROUND
 
 2
 Fox, which is controlled by Murdoch, acquired a TV station in New York City in 1986. At the time, Murdoch also owned the New York Post ("the Post"). He was granted two years to divest his interest in the Post so as to satisfy the FCC's rule, 47 C.F.R. Sec. 73.3555(d) (1994), prohibiting common ownership of a broadcast station and a daily newspaper in the same market. See Health and Medicine Policy Research Group v. FCC, 807 F.2d 1038 (D.C.Cir.1986). In 1988, Murdoch sold the Post to real estate developer Peter Kalikow, although Murdoch's company remained contingently liable for some of the Post's obligations. Kalikow declared personal bankruptcy in August 1991. He and his bankruptcy creditors committee sought to sell all or part of the Post and conducted negotiations with various groups throughout 1992, without success. In February 1993, real estate developer Abraham Hirschfeld agreed to purchase the Post. Pursuant to the terms of the agreement, Kalikow ended his search for other buyers until the court in his personal bankruptcy proceeding ordered the recommencement of solicitation as a precondition of its approval of the Hirschfeld contract. Several potential purchasers expressed interest at this time, but none found the Post's financial condition acceptable. See generally Fox Television Stations Inc., 8 F.C.C.R. 5341 (1993).
 
 
 3
 In March 1993, the bankruptcy court granted Hirschfeld operational control of the Post based in part on his pledge to invest $3 million in the newspaper. Hirschfeld then fired the Post's editor-in-chief and several other editors, resulting in a revolt against him by the remaining editorial staff. As these events unfolded, it became apparent that Hirschfeld would not be able to complete the purchase of the paper, and Kalikow put the Post's parent company, New York Post Co., into bankruptcy. The Post's circulation began to drop, as did its advertising sales and its ability to obtain production supplies, pay taxes, and provide employee benefits.
 
 
 4
 As the Post's condition deteriorated, various officials, including then-Governor Mario Cuomo, asked Murdoch to repurchase the paper. Other potential bidders also expressed interest at this time. Champion Holding Company ("Champion") expressed its interest in obtaining the Post and attempted to tender a $1,000,000 check to the bankruptcy court, which the court did not accept because offers from other bidders were not before the court at that time. Champion drew up a memorandum of understanding with the New York Post Company's Vice President Steven Bumbaca to purchase the Post's assets for $7,400,000, which would be signed after approval by the Post's committee of unsecured creditors and upon evidence of authorization of Bumbaca to execute the memorandum on behalf of the Post. The creditors committee deemed Champion's offer unacceptable, however, due to a deficient purchase price, reliance on "unrealistic union concessions," and insufficient amounts of working capital. The committee notified Champion that the committee was not interested in Champion's offer, and, although Champion told the committee that its interest continued, it ultimately withdrew its offer three months later, in June 1993.
 
 
 5
 On March 29, 1993, Murdoch's company executed a management agreement for the Post, which was approved by the court in the corporate bankruptcy. Murdoch agreed to assume management of the paper, conditioned, among other things, upon his obtaining a permanent waiver of the FCC's ban on cross-ownership and negotiating new agreements with the Post's labor unions. The agreement provided for its termination on June 1, 1993, although Murdoch's company retained the right to put off termination for an additional thirty days in the event Fox had not yet obtained a waiver from the FCC.
 
 
 6
 Fox's request for a permanent waiver rested primarily on two grounds: first, that no other viable purchaser had demonstrated a willingness to undertake the large financial burden of revitalizing the Post or shown the managerial and editorial skills needed to operate in New York's competitive news environment; and second, that application of the cross-ownership rule here would disserve the underlying policy of diversity and instead result in elimination of a competitive voice. Appellants, Champion, and others opposed Fox's request for a permanent waiver. Appellants questioned whether the FCC has the power to grant permanent waivers under the cross-ownership rule because Congress provided in Pub.L. No. 102-395, 106 Stat. 1846 (1992), that appropriated funds may not be used to repeal or reexamine the rules and policies established to administer the cross-ownership rule.
 
 
 7
 They also pressed for a hearing on alleged misrepresentations by Fox and on the particulars of the alleged inability to sell the newspaper and of Murdoch's offer. Champion claimed that Murdoch was not the only viable purchaser for the Post and described its offer to buy the paper. Some commenters, who appear in this appeal as intervenors, argued that preserving the Post would not help diversity because its demise would free up advertising funds that could go to minority-owned papers and also suggested that if Murdoch was eliminated, minority businesspersons might buy the paper. These individuals and other groups also claimed that the Post had a policy of attacking the black community and argued that its demise would therefore be beneficial to diversity.
 
 
 8
 The FCC considered Fox's waiver request in an expedited process and, in a declaratory ruling adopted June 29, 1993, granted the permanent waiver by a two-to-one vote. Fox Television Stations Inc., 8 F.C.C.R. 5341 (1993). The FCC stated that the "unique and severe financial situation of the Post that apparently confronts the bankruptcy court ... warrants our immediate attention," and concluded that a quick decision would minimize any conflict with the objectives of bankruptcy law, which are equality of distribution among creditors, a fresh start for debtors, and efficient administration of cases. Id. at 5343-44. The FCC reasoned that its decision on Murdoch's eligibility best served the public interest by allowing the bankruptcy court to consider the full complement of eligible bidders for the Post. It took no position on whether Murdoch was the paper's only viable buyer, but noted that the exclusion of Murdoch as a potential purchaser might "ultimately disserve the underlying diversity purposes of the cross-ownership rule and would not accord appropriate deference to the policies and objectives of bankruptcy law." Id. at 5344.
 
 
 9
 The FCC stated that the proscription against common ownership of newspapers and broadcast stations arose from two fundamental principles, the promotion of maximum diversification of program viewpoints and the prevention of undue concentration of economic power, but noted that diversity was the preeminent goal. Id. at 5347. The Commission observed that it devised waivers for the cross-ownership rule for four situations wherein application of the rule would be unduly harsh:
 
 
 10
 (1) where there is an inability to dispose of an interest to conform to the rules; (2) where the only sale possible is at an artificially depressed price; (3) where separate ownership and operation of the newspaper and station cannot be supported in the locality; and (4) where, for whatever reason, the purposes of the rule would be disserved by divestiture.
 
 
 11
 Id. at 5348 (footnote omitted).
 
 
 12
 The FCC considered the Post's insolvency and need for a huge capital outlay coupled with newspaper expertise to survive, that the paper was put into bankruptcy after a 16-month search failed to uncover a suitable buyer, and that there was evidence that Murdoch's ownership might be pivotal to the paper's viability. Id. at 5349-50. The FCC therefore concluded that Fox's request fell under the fourth criterion for waiver and that a waiver was warranted. The Commission further concluded that a permanent waiver was appropriate as an accommodation between communications policies and bankruptcy policies since it removed the uncertainties about the status of Murdoch as a bidder in the bankruptcy court. Id. at 5349. The FCC reasoned that given the wide array of broadcast stations and newspapers in New York, Murdoch's potential for amassing an undue amount of control in the marketplace for ideas was unlikely and any cost to diversity from the waiver would be outweighed by the preservation of the Post. Id. at 5351-52.
 
 
 13
 One of the appellants, Caucus for Media Diversity, had requested a further factual inquiry before the FCC to explore its allegations that Fox made misrepresentations of material fact in its waiver request by stating that it was imperative that the Commission act by June 1 and asserting that Murdoch was the only serious potential purchaser for the Post. The FCC determined that the totality of the evidence did not raise a substantial and material question of fact justifying further inquiry into these matters. Id. at 5355. While it found Fox's claim that Commission action by June 1 was "imperative" to be an overstatement and potentially misleading, the FCC further concluded that other evidence showed that Fox described the time limit accurately, disclosed the possibility of an extension to the Commission, and did not materially distort the facts. Id. at 5356. The Commission also determined that Fox's statements regarding other purchasers merely indicated that, in its opinion, there were no other viable purchasers and Fox was unaware of Champion's continued interest when it filed its waiver request. Id. at 5356-57.
 
 
 14
 Caucus for Media Diversity petitioned for reconsideration based on the alleged misrepresentations made by Fox. The FCC denied reconsideration on December 17, 1993, on the basis that it already fully considered these matters in the declaratory ruling. See Fox Television Stations Inc., 8 F.C.C.R. 8744 (1993).
 
 
 15
 On September 15, 1993, the bankruptcy court authorized the purchase of the Post by Murdoch's company. The court observed that Murdoch's company was the only bidder for the newspaper even though there had been a reasonable opportunity for others to compete. The court also noted that the Post had suffered continuing and substantial losses during the bankruptcy proceedings and that, absent the purchase by Murdoch, it was likely that the newspaper would liquidate. In re The New York Post Co., No. 93-B-41306 (Bankr.S.D.N.Y.1993).
 
 II. DISCUSSION
 A. Alleged Misrepresentations by Fox
 
 16
 Appellants argue that Fox made a serious misrepresentation by falsely implying that there was a June 1, 1993, deadline based on the termination date of the court-approved management agreement and that the FCC conceded that some of these statements by Fox, while technically accurate, were potentially misleading and overstatements. Appellants assert that the Commission's decision that no further inquiry was required because there was no evidence of deceptive intent by Fox is untenable because the filing of the actual management agreement with the FCC, which contained the thirty-day extension provision, was insufficient to counteract the effect of Fox's repeated statements about the June 1 deadline. As further evidence of Fox's alleged duplicity, appellants point to the fact that Murdoch's lawyer told the bankruptcy court that Murdoch was prepared to extend the extra thirty days if necessary to obtain the FCC waiver. Appellants argue that this constitutes prima facie evidence of Fox's intent to deceive, see David Ortiz Radio Corp. v. FCC, 941 F.2d 1253, 1260 (D.C.Cir.1991) (fraudulent intent shown by misrepresentation coupled with proof that party making it knows it is false), and assert that the FCC improperly failed to order a hearing on Fox's misrepresentation. See California Pub. Broadcasting Forum v. FCC, 752 F.2d 670, 680 (D.C.Cir.1985) (FCC's denial of a hearing on a substantial and material factual dispute on issue of misrepresentation was arbitrary and capricious). Moreover, appellants claim the FCC erred in assuming that the evidence must prove an intent to deceive before a hearing is required. See Citizens for Jazz on WRVR, Inc. v. FCC, 775 F.2d 392, 397 (D.C.Cir.1985) (to warrant a hearing, allegations must merely present a substantial and material question of fact, not actually prove misrepresentation).
 
 
 17
 Similarly, appellants assert that the FCC arbitrarily and capriciously departed from precedent by denying a hearing on the alleged misrepresentation by Fox about the existence of other potential purchasers, especially since the Commission admitted that some of Fox's statements in this regard were troubling. They also allege that the FCC's conclusion that there was not a substantial question on Fox's misrepresentation on this issue is not tenable, especially given the Commission's long-established requirement that applicants be "scrupulous in providing complete and meaningful information...." Lorain Journal Co. v. FCC, 351 F.2d 824, 830 (D.C.Cir.1965), cert. denied, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966). Appellants also claim that Fox has shown a pattern of misrepresentation in its actions in a comparative renewal proceeding for KTTV, Los Angeles, and that the FCC erred in refusing to order further inquiry into this behavior.
 
 
 18
 The Administrative Procedure Act, 5 U.S.C. Sec. 701 et seq. (1988), provides that a court must uphold a federal agency's action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. at Sec. 706(2)(A). Under this deferential standard, we "must determine whether the agency has articulated a rational connection between the facts found and the choice made [and] may reverse only if the agency's decision is not supported by substantial evidence or the agency has made a clear error in judgment." Kisser v. Cisneros, 14 F.3d 615, 619 (D.C.Cir.1994) (internal quotation marks and citations omitted).
 
 
 19
 The FCC will hold a hearing only when a dispute is clearly and adequately alleged, is factual, and rises to the level of a substantial and material issue. David Ortiz Radio Corp., 941 F.2d at 1257. In reviewing the FCC's denial of a requested hearing, we play only a limited role because the FCC's discretion and expertise are "paramount in this sphere." Id. The FCC argues that a hearing on the misrepresentation issue was unnecessary because appellants challenge only the inferences that the FCC drew from uncontested facts. See National Ass'n for Better Broadcasting v. FCC, 591 F.2d 812, 815 (D.C.Cir.1978) (hearing not required to resolve disputes over the proper inferences to be drawn from agreed-upon facts). This court, however, has held that the question of intent to mislead is a factual one which, if "substantial," will justify an evidentiary hearing. See California Public Broadcasting Forum v. FCC, 752 F.2d 670, 679-80 (D.C.Cir.1985); Citizens for Jazz on WRVR, Inc., 775 F.2d at 395-96. The question, then, is whether appellants presented "such strong circumstantial evidence of misrepresentation as to justify reversing the Commission's judgment that the ultimate question was not a substantial one." Citizens for Jazz on WRVR, Inc., 775 F.2d at 396.
 
 
 20
 The FCC carefully considered all of appellants' allegations, evaluated the record, and determined that there was not a substantial and material issue regarding Fox's intent to mislead by its statement that a decision by June 1 was imperative. The statements by Fox can fairly be characterized as bombast rather than outright falsehoods, and the FCC relied on other evidence in the record suggesting that Fox did not actually attempt to mislead the FCC on the relevant issues. See Citizens for Jazz on WRVR, Inc., 775 F.2d at 395 (FCC must weigh the allegations of misrepresentation against the other evidence before it and then decide whether there is a substantial question of fact such that the totality of the evidence arouses a sufficient doubt on the point requiring further inquiry). Accordingly, the FCC's conclusion that allegations regarding Fox's misrepresentations did not raise a material issue requiring a hearing was not arbitrary and capricious or unsupported by the record. See WHW Enters., Inc. v. FCC, 753 F.2d 1132, 1139 (D.C.Cir.1985) (in reviewing FCC's application of standards for candor and forthrightness, court looks only to see whether Commission's conclusions and findings are supported by the record and are not arbitrary and capricious).
 
 
 21
 Likewise, the FCC considered appellants' allegations that Fox misrepresented the non-existence of other potential purchasers and concluded that Fox stated that there were no other viable buyers for the Post. Later events, although not determinative of Champion's qualifications at the time of the waiver request and the FCC's decision, appear to have borne out Fox's conclusion that Champion was not a viable bidder for the Post. While Champion did offer to buy the paper, its proposal was rejected by the Post's committee of unsecured creditors as deficient in price and insufficient in working capital. Champion actually withdrew its offer to buy the Post three months before the bankruptcy court made its final decision. Moreover, Murdoch was the only bidder for the paper before the bankruptcy court, a fact which supports the reasonableness of the Commission's conclusion that Fox did not engage in a misrepresentation when it stated that Murdoch was the only viable bidder.
 
 
 22
 As for the licensing proceeding in Los Angeles, while the Review Board found that Fox violated FCC rules, the Commission ultimately rejected the Review Board's findings in this matter. See Fox Television Stations, Inc., 9 F.C.C.R. 62 (1993). Accordingly, the FCC did not act in an arbitrary or capricious manner in determining that the allegations regarding Fox's misrepresentation in the renewal proceeding did not require a hearing.
 
 
 23
 B. Ripeness of Waiver Request and Completeness of the Evidence Before the FCC
 
 
 24
 Appellants assert that Fox's request for a waiver was unripe because Murdoch had no binding commitment to buy the Post when Fox filed with the FCC. Because there was no formal deal, they claim that the FCC had an incomplete basis upon which to reach an informed decision. Cf. United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 771-72, 100 L.Ed. 1081 (1956) (waiver hearing provided for parties presenting completed applications and adequate reasons for waiver). Fox's waiver request was incomplete, appellants maintain, because it did not give the FCC the full particulars needed, such as a copy of the 1988 agreement to sell the Post to Kalikow. Cf. Washington Star Communications, Inc., 54 F.C.C.2d 669 (1975). The FCC's failure to hold an evidentiary hearing, appellants argue, meant that the Commission did not have before it the proper evidence, which would have shown that allowing Murdoch to purchase the Post would not help diversity because, inter alia, the demise of the Post would benefit minority-owned papers.
 
 
 25
 Appellants' arguments fail on several grounds. First, regarding ripeness, unlike the case or controversy requirement for a federal court, under 5 U.S.C. Sec. 554(e) (1988), an agency may issue a declaratory order to terminate a controversy or remove uncertainty. See Chavez v. Director, Office of Workers Compensation Programs, 961 F.2d 1409, 1414 (9th Cir.1992) (ripeness doctrine derives from Article III limitations on federal judicial power that are inapplicable to administrative agencies). Moreover, Fox's waiver request was not hypothetical and Murdoch had a substantial financial liability based upon his contributions under the interim management agreement, which the FCC determined amounted to $4.224 million in the first six weeks alone.
 
 
 26
 In the Washington Star case relied on by appellants, the FCC stated that while the inability to sell a newspaper could be the basis for a waiver, a waiver was not justified in that case because the full particulars on efforts to sell the paper had not been supplied. 54 F.C.C.2d at 675. The FCC concluded that Washington Star was distinguishable because, in this case, the Commission had before it sufficient facts to grant a waiver under the fourth basis for a waiver, that is, where the purposes of the rule would be disserved by divestiture. Fox Television, 8 F.C.C.R. at 5354 n. 56.
 
 
 27
 While the asking price for the Post was not clearly set forth in Fox's waiver request, for several reasons that omission is not dispositive of the adequacy of the waiver request in this case. First, the FCC evaluated the waiver request not under the inability-to-sell criterion used in Washington Star, but under the criterion that considers whether the purposes of the rule would be disserved by divestiture. The Commission chronicled in detail the extensive efforts to sell the paper and concluded that the purposes of the cross-ownership rule would be disserved by precluding the strongest bidder from participating in the bankruptcy court's sale of the Post since there were few, if any, others who would take on the troubled newspaper.
 
 
 28
 Second, the Post, unlike the Washington Star, was in bankruptcy and, as described by the bankruptcy court, was suffering continual and substantial losses such that during the proceedings its value as a going concern was rapidly diminishing. See In re The New York Post Co., Inc., slip op. at 4. Thus, considering the Post's dire financial situation, the prospect of finding a bidder willing to take on the large liabilities of running the newspaper was the real concern, rather than the newspaper's sale price. Third, in Washington Star, the owner of the paper both controlled the sale process and prosecuted the waiver application before the FCC, seeking a waiver on the basis of inability to sell the newspaper. The Commission was concerned that the owner had not demonstrated that he had made a reasonable, good-faith effort to sell and could not find a willing and able buyer, which was fundamental to granting a waiver premised on an inability to sell, and it ordered an evidentiary hearing on this issue. By contrast, in the instant case, the bankruptcy court, not Kalikow or Fox, supervised the New York Post Co.'s attempts to sell the newspaper, and this proceeding had safeguards to ensure against manipulation of the sales process. The FCC deferred to the bankruptcy court's role in determining whether bids for the Post were fair and limited its inquiry to whether, if Murdoch was the successful bidder, a permanent waiver would be in the public interest. Accordingly, Washington Star is distinguishable and the FCC did not err by failing to order a hearing on the specifics of Murdoch's bid for the Post.
 
 
 29
 Additionally, in rejecting appellants' argument that the failure of the Post would serve diversity, the FCC stated that the cross-ownership rule was never intended to cause the demise of an existing newspaper but to promote diversification of the mass media as a whole. Given the broad authority of the FCC to determine where the public interest lies in the regulation of broadcasting to foster diversity, see FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 794-95, 98 S.Ct. 2096, 2111-12, 56 L.Ed.2d 697 (1978), its decision to preserve an existing source of information seems reasonable and must therefore be upheld by this court.
 
 C. Propriety of Granting a Permanent Waiver
 
 30
 Appellants assert that the FCC failed to explain why it deviated from precedent and granted a permanent, rather than a temporary, waiver. See Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970) (an agency's view of what is in the public interest may change, but an agency changing its course must supply a reasoned analysis indicating that prior policies are being deliberately changed, not casually ignored), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). They allege that Fox failed to meet its heavy burden of proof to justify a permanent waiver, see News America Publishing, Inc. v. FCC, 844 F.2d 800, 803 n. 4 (D.C.Cir.1988); Health & Medicine Policy Research Group, 807 F.2d at 1042-43, by submitting information showing that a permanent waiver was necessary, rather than merely beneficial, to the Post's continued existence. Moreover, appellants contend that not only does the grant of a permanent waiver to Fox, part of the world's largest media company, effectively eviscerate the long established cross-ownership rule, it violates Congress's direction that no federal funds be used to repeal or reexamine the rule. See Pub.L. No. 102-395, 106 Stat. 11846 (1992). It is also contrary to the public interest, appellants argue, because the Post, under Murdoch, will and has already engaged in anti-competitive behavior by giving undue attention to a program on Fox's TV station. Further, appellants assert that the FCC's decision was arbitrary and capricious because it failed to evaluate the impact of the waiver on the black community by considering appellants' arguments and expert testimony that the New York media market is noncompetitive in its service of minority audiences. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971) (court must determine whether agency's decision was based on consideration of all relevant factors); Weyburn Broadcasting Ltd. Partnership v. FCC, 984 F.2d 1220, 1227-28 (D.C.Cir.1993).
 
 
 31
 The FCC reasoned that granting the waiver would accommodate federal bankruptcy policies without undermining the cross-ownership rule's goals of competition and diversity. See, e.g., Telemundo, Inc. v. FCC, 802 F.2d 513, 518 (D.C.Cir.1986) (FCC should approve the most advantageous sale of a bankrupt's assets if it will not unduly interfere with FCC's mandate to ensure that licenses are used and transferred in accordance with the Communications Act). It further concluded that a permanent, rather than a temporary, waiver was appropriate based on the persuasive business reasons Fox offered showing that a permanent waiver was necessary to its long-term strategy for reviving the Post. For example, without a permanent waiver, Fox would be unable to conclude meaningful negotiations with the Post's labor unions, suppliers, distributors, creditors, and advertisers. Also, Murdoch could not be expected to sustain the huge operating losses and undertake the enormous commitment necessary to revitalize the Post without knowing whether he would ultimately be forced to sell the newspaper or the TV station. Granting a temporary waiver would have been meaningless and would not have achieved the goal of having a viable bidder for the paper, the FCC reasoned, because Murdoch would not pursue his bid for the Post in that circumstance and the bankruptcy court might be left with few, if any, viable offers to consider. Thus, in the FCC's view, granting the waiver helped the debtor, the creditors, and the bankruptcy court by removing uncertainties as to the viability of the primary bidder.
 
 
 32
 The FCC also concluded that a grant of the waiver was unlikely to have a significant impact on the diversity and competition concerns underlying the cross-ownership rule and that it has no authority to base its actions upon the anticipated content of the newspaper. It found that appellants' view of the New York market was not borne out since the record showed that not only is New York's media market uniquely competitive, the Post and Murdoch's TV station have a very small audience and advertising share of it. As for the charge that the Post had already engaged in anticompetitive behavior, the FCC determined that the evidence of this was insufficient since it merely consisted of a three-paragraph article claiming that the Post promoted a program to be aired on Fox's New York station.
 
 
 33
 Despite appellants' assertions, it is not clear that the FCC actually changed course in granting Fox a permanent waiver. Since the promulgation of the cross-ownership rule, the FCC has provided for waiver in exceptional circumstances, National Citizens Committee for Broadcasting, 436 U.S. at 786 n. 9, 98 S.Ct. at 2107 n. 9; Health & Medicine Policy Research Group, 807 F.2d at 1041 n. 4, such as where strict application of the rule would "defeat rather than advance the goal of media diversity." News America Publishing, Inc., 844 F.2d at 803. In announcing the cross-ownership rule, the Commission specifically contemplated the possibility of permanent waivers. See Second Report & Order, 50 F.C.C.2d 1046, 1076 n. 24, 1085 (1975). Although the Commission has thus far granted permanent waivers only to preserve existing ownership patterns, see, e.g., Field Communications Corp., 65 F.C.C.2d 959 (1977), it has never ruled out the possibility of granting permanent waivers in other extraordinary circumstances.[1] Indeed, in Washington Star, the Commission did not reject the request for a permanent waiver but merely set it for a hearing to resolve certain issues. The applicant subsequently amended its request to seek instead a temporary waiver, so the FCC never reached the question of whether a permanent waiver would have been justified in those circumstances. See also Field Communications Corp., 65 F.C.C.2d 959 (1977) (Commission granted a permanent waiver of the cross-ownership rule where transaction did not actually create a new ownership pattern and noted that waivers can be appropriate based on the exigencies of the situation). Furthermore, because waivers for extraordinary circumstances have been contemplated since the rule's adoption, the FCC's determination that such circumstances obtain and warrant a waiver does not violate Congress's ban on repealing or reexamining the rule.
 
 
 34
 While appellants claim that Fox failed to submit adequate information to show that a permanent waiver was necessary, the FCC reasonably found that the evidence was sufficient based on Fox's submissions about the need for a long-term business plan for the Post. The FCC did explain in some detail why it granted a permanent waiver in this case, and its conclusion that Fox met the heavy burden for a permanent waiver and that the grant of the permanent waiver is in the public interest, is entitled to substantial judicial deference. See Health & Medicine Policy Research Group, 807 F.2d at 1043. Additionally, the fact that Murdoch previously had a temporary, two-year waiver and the Post floundered when he divested it, lends further support to the FCC's conclusion that a temporary waiver was not adequate.
 
 
 35
 Because a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency, in such circumstances complete factual support in the record for the FCC's judgment or prediction is neither possible nor required. National Citizens Comm. for Broadcasting, 436 U.S. at 814, 98 S.Ct. at 2121-22. Furthermore, the FCC properly disregarded arguments about the editorial content of the Post because the application of the cross-ownership rule cannot lawfully be based on a party's political, economic, or social views. See id. at 801, 98 S.Ct. at 2115. Finally, the Commission did consider, but rejected, appellants' evidence of alleged anti-competitive conduct by the Post under Murdoch's control, and any future anti-competitive conduct can be raised and considered in the proceeding to renew the license for Fox's New York station.
 
 D. Necessity of Recusal by Commissioners
 
 36
 Appellants raise a final unfortunate ad hominem attack on the Commission's decision. During the administrative proceedings, one or more commenters suggested Chairman Quello and Commissioner Duggan should recuse themselves from the proceedings. Both declined; Chairman Quello in a statement reviewing the standards for recusal and noting that there was no evidence of prejudgment warranting his recusal; Commissioner Duggan in a statement describing the commenters' suggestion as based on speculation. Both Commissioners spoke correctly. There is no foundation for recusal. Appellants have nonetheless renewed the attack on then-Chairman, now Commissioner, Quello before this court.
 
 
 37
 The evidence of bias on Quello's part is no more than speculation. Appellants state that Murdoch's lawyer told the bankruptcy court that he had received sufficient assurances that the waiver could be obtained from the FCC. The clear implication of this statement, appellants maintain, is that someone at the FCC gave Murdoch these assurances. Even if it followed from the lawyer's statement that someone at the FCC had made an improper statement, we are left to wonder why we should assume it to be Quello.
 
 
 38
 As further evidence of improper contacts between Murdoch and the Commission, appellants point to three newspaper articles suggesting that the FCC supported giving Murdoch a waiver. Specifically, they argue that Chairman Quello should have recused himself because he appeared to have prejudged the issue since he stated that he did not have any objections to a waiver request and that his statements that he offered no assurances to Murdoch's lawyer and merely meant he did not object to the filing of the waiver request are unavailing and illogical. See Cinderella Career and Finishing Schools, Inc. v. FTC, 425 F.2d 583, 590-91 (D.C.Cir.1970) (agency chairman should have recused himself in light of his public statements indicating prejudgment of the case). Appellants also urge that when there is a public perception that an agency has already made up its mind, it is important to avoid even a perception of impropriety, especially when dealing with a powerful figure like Murdoch. They misperceive the law of recusal.
 
 
 39
 We review an agency member's decision not to recuse himself from a proceeding under a deferential, abuse of discretion standard. Air Line Pilots Ass'n v. United States Dep't of Transp., 899 F.2d 1230, 1232 (D.C.Cir.1990). In an adjudicatory proceeding, recusal is required only where "a disinterested observer may conclude that [the decisionmaker] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." Cinderella Career and Finishing Schools, Inc., 425 F.2d at 591 (citations omitted). In other words, we will set aside a commission member's decision not to recuse himself from his duties only where he has "demonstrably made up [his] mind about important and specific factual questions and [is] impervious to contrary evidence." United Steelworkers of America v. Marshall, 647 F.2d 1189, 1209 (D.C.Cir.1980), cert. denied, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). At the administrative stage, Commissioner Duggan described the commenters' requests for his recusal as having a "vague and flimsy basis." At this stage, the case for the reversal of Commissioner Quello's decision not to recuse has essentially no basis at all.
 
 
 40
 In support of its recusal argument, the Caucus for Media Diversity points to five Joint Appendix references as allegedly establishing that "interim Chairman James Quello and others created a public impression that FCC had 'approved' Fox's waiver request before it was even filed." Caucus's Br. at 21. For ease of reference we will use the Joint Appendix pages cited by appellant in support of its proposition: J.A. 467, 496, 499, 502, 505. The first of these is not in any remote sense evidence of Quello's need to recuse or evidence of anything else. It is simply a comment filed by one of appellants in the administrative proceedings alleging that Quello had prejudged the case, principally because an attorney for Murdoch, according to appellants, stated that he had received "sufficient assurances" that a permanent waiver would be granted. Appellants have given us their position here. The fact that they have said the same thing before is no evidence that it is correct. We are left with four possible J.A. references to support their recusal argument.
 
 
 41
 As to the first of the remaining four, J.A. 496 is a newspaper article from the Metro Section of the March 29, 1993, New York Times. We seriously question whether a New York Times article is admissible evidence of the truthfulness of its contents, see FED.R.EVID. 802 (hearsay not admissible except in circumstances not applicable here) and 801(c) (hearsay defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Nonetheless, even if it were, the particular article in question says nothing at all about Quello, let alone anything compelling his recusal. The closest it comes is the statement, "But officials who once opposed a waiver say they will support one now to save the Post." Given that everyone in the case knew that elected officials including the Governor of New York and at least one of its Senators had come out in favor of saving the paper, there is not only no reason to assume that the article made reference to Quello, there is every reason not to make such an assumption.
 
 
 42
 The third reference, J.A. 499, is a one-paragraph "brief" from Broadcasting and Cable Magazine of March 29, 1993. Ignoring the hearsay difficulty, this clipping does report that Chairman Quello "said he 'would have no objections' to a waiver request." Quello explained in the statement we referenced above that his lack of objection was to the filing of a request, not to whether or not the request would be granted.
 
 
 43
 The fourth reference, J.A. 502, is a clip from The Daily Variety, an entertainment trade paper, from April 19, 1993. While the portion of the article apparently intended for our consideration by appellants does state "the FCC sending signals the waiver would be approved, Murdoch's request was thought to be on a fast track," the gist of the article is that Murdoch might have difficulties in getting his waiver approved because the FCC was "throwing a wrench into the News Corp. chairman's plans." Thus, if this entertainment press article were taken as evidence of anything, it would be that Chairman Quello had not made his mind up in favor of Murdoch's position.
 
 
 44
 The final reference, J.A. 505, is a short, unsigned article from the March 31, 1993, Daily Variety. The nearest to a pertinent part is a sentence that claims "interim FCC Chairman James Quello has hinted the commission will sign off on the deal." It does not say who heard him so hint or how he "hinted." Even without the deferential standard which we apply to decisions not to recuse, there would be no way that we could find that Commissioner Quello had acted improperly. It is unfortunate that appellants thought it necessary to mount this ad hominem challenge.
 
 III. CONCLUSION
 
 45
 The FCC's detailed decision granting Fox a permanent waiver was not arbitrary and capricious or unsupported by the record. Accordingly, the appeal is hereby
 
 
 46
 Denied.
 
 
 
 [1]
 "[T]he burden on an applicant for a permanent waiver," however, "is considerably heavier than for a temporary one." News America Publishing Inc., 844 F.2d at 803